A94A1472. DUNAWAY v. PARKER et al.
(453 SE2d 43)

McMURRAY, Presiding Judge.

This appeal is part of an on-going difference between Joyce D. Parker and William B. Dunaway over the remains of their father's once unique and highly successful pharmaceutical business, Dunaway Drug Stores, Inc. ("the corporation"). The litigation began when Joyce D. Parker, as trustee of trusts for the benefit of her children and as guardian of William Sidney Parker, A. Sidney Parker, Joyce L. Parker and Day M. Parker, individually and in their capacities as shareholders of the corporation, (plaintiffs) asserted alternative direct or derivative shareholder claims against William B. Dunaway (defendant), alleging defendant breached fiduciary duties as chief executive officer of the corporation by furthering his own interests (at corporate expense) while structuring, negotiating and executing sale of virtually all assets of the corporation to Jack Eckerd Corporation ("Eckerd Drugs"). Specifically, plaintiffs allege that defendant improperly allocated $300,000 plus a company car to himself in exchange for his promise not to compete with Eckerd Drugs for three years and that defendant improperly amended two corporate leases (under which he was landlord) prior to negotiating the asset sale, thereby decreasing the perceived value of the corporation's leasehold estates. Plaintiffs later amended their claims under the pretrial order, alleging they "inspected the books of the Corporation [after execution of the asset sale to Eckerd Drugs] and discovered that [defendant] had been involved in self-dealing and diverted other Corporate funds and opportunities to his own benefit."

Defendant denied the material allegations of the complaint and pertinently outlined his defense (in the pretrial order) as follows: "[I] neither improperly gained from the inclusion of these terms nor breached any duty to the Corporation or its shareholders by negotiating these terms. The terms of the sale, including the terms about which the Plaintiffs now complain, were fair to the Corporation and to the Plaintiffs. Furthermore, the terms of the sale, including the terms at issue in this lawsuit, were unanimously approved by the board of directors of the Corporation, of which two of the Plaintiffs were members. . . . The Plaintiffs furthermore are barred or estopped from asserting these claims by reason of the Board's approval of the Eckerd transaction and related transactions; and by Joyce and Sidney Parker's abstention from such vote." The case was subsequently tried before a jury and the evidence, construed in a light

which most favorably supports the jury's verdict, reveals the following:

In 1943, W. H. Dunaway became the primary founder of Dunaway Family Drugs, then holding about 94 percent of the corporate stock. As the business developed into a chain of sucessful retail establishments, ownership of the corporation remained exclusively with the Dunaway family, W. H. Dunaway gifting substantially equal portions of his share of the corporation to the families of his children, Joyce D. Parker and William B. Dunaway. W. H. Dunaway gave his spouse, Lanore Dunaway, ten percent of the corporate stock and Boykin Dunaway sold his six percent share of the corporation to defendant after W. H. Dunaway died in 1987. This transaction, along with a five percent gift of corporate stock from his mother, ultimately gave defendant's immediate family control of fifty-two percent of the corporate stock. Joyce D. Parker's side of the family ended up with either thirty-seven or forty-two percent of the corporate stock, depending on the status of a five percent gift of corporate stock tendered by Lanore Dunaway to Joyce D. Parker after the death of W. H. Dunaway.

Although Joyce D. Parker and her spouse, A. Sidney Parker, ultimately became members of the corporation's board of directors, neither were regularly employed by the corporation nor directly participated in its daily operations.[1] On the other hand, defendant served the corporation from early adolescence, becoming a regularly employed registered pharmacist after he completed pharmacy school and moving on as the corporation's president after W. H. Dunaway slowed his activities in the family business in the 1970's. By the 1980's, defendant dominated control of the corporation's daily operations and strategic decisions.

In 1981, A. Sidney Parker helped defendant acquire favorable quasi-public financing for real property located in the City of Marietta. The nature of this unique financing made possible favorable lease transactions between defendant, as lessor, and the corporation, as lessee. The resulting leases were intended to cover defendant's expenses on the leased premises, provide him with a tax shelter and bring him profits in the form of equity upon future sale of the leased premises. In return, the corporation would acquire a warehouse and retail space in the City of Marietta ("the Marietta Store") at rates far below market value, i.e., $6,500 per month for the warehouse and $2,000 per month for the Marietta Store. However, soon after the transaction closed, defendant covertly increased the corporation's rent on the warehouse to $10,000 per month, had the rent increase

---

[1] A. Sidney Parker is an attorney and he periodically assisted the corporation in certain matters.

approved by an executive committee of the corporation (which did not include the Parkers) and avoided informing the corporation's board of directors. In late 1987, A. Sidney Parker heard about this "under-the-table" transaction and confronted defendant. Defendant retrieved the amended lease from his files, "read down his lease [and then] threw [it] across to [A. Sidney Parker and] said, there it is, read it." This response served to aggravate tension between the Parkers and Dunaways, which was due (at least in part) to defendant's long-standing refusal to pay dividends on the corporation's stock.

After W. H. Dunaway died in 1987, the Parkers and the Dunaways began negotiating an agreement for defendant to purchase the Parker's interest in the corporation. However, by the latter part of 1988 it became apparent to defendant that the buy-out would not go through so he covertly contacted Eckerd Drugs and proposed selling virtually all of the corporation's assets. Eckerd Drugs was responsive and, in contemplation of future negotiations, defendant secretly amended the corporation's warehouse and Marietta Store leases to terms favorable to his own interests, thereby devaluing the corporation's leasehold estates. The lease amendments were subsequently approved by an executive committee of the corporation (to the exclusion of the Parkers), but were never presented to the corporation's board of directors. Although the revised leases were never enforced against the corporation, they were (apparently) used in valuing the corporation during defendant's negotiations with Eckerd Drugs.

On April 29, 1989, defendant executed an asset sale agreement with Eckerd Drugs, obligating the corporation to sell virtually all of its assets. However, Eckerd Drugs insisted upon open approval of the asset sale agreement by the corporation's board of directors and shareholders and this requirement was made a condition to the asset sale agreement. The asset sale agreement provided that Eckerd Drugs would pay defendant $300,000 and grant him title to a company car in exchange for defendant's promise not to compete with Eckerd Drugs for three years. The agreement further called for Eckerd Drugs and defendant to enter into a "termination agreement with respect to the lease of the Warehouse . . . in exchange for the advance payment [to defendant] at Closing of one-year's rent ($124,000.00)." Eckerd Drugs also agreed to leave defendant's warehouse in "broom-clean condition" no later than 30 days after closing the asset sale agreement. The Marietta Store lease was renegotiated under the asset sale agreement, providing for a rent increase from approximately $24,000 per year plus a percentage of the store's gross sales to "the minimum annual base rent payable to [defendant of] $45,747.00 for the period beginning with the date of such amendment and ending January 31, 1993 and $52,785.00 for the period beginning February 1, 1993 and ending January 31, 1999. . . ."

On April 30, 1989, plaintiffs were notified of the terms of the asset sale agreement and, on May 23, 1989, a special meeting of the corporation's board of directors was called to consider the proposal to sell substantially all assets of the corporation to Eckerd Drugs. At the board meeting, Joyce D. Parker questioned how amending the corporation's warehouse lease before defendant began negotiations with Eckerd Drugs benefited the corporation. Defendant responded "that the overall term of the Warehouse lease would be reduced by 7½ years and that the total obligation would be less. B. B. Dunaway [then] stressed that the rent increases did not apply to the Company, but had been written into the leases only for possible future use." After this explanation, Joyce D. Parker and A. Sidney Parker opposed adopting the executive committee report approving defendant's strategic amendments of the warehouse and Marietta Store leases. Nonetheless, the measure passed by a vote of the remaining seven members of the board of directors.

When the issue of the asset sale to Eckerd Drugs was brought to the floor for discussion, Joyce D. Parker agreed that sale of the corporation's assets was necessary. However, she questioned whether the asset sale agreement with Eckerd Drugs should be approved since "there had been no definitive agreement among the shareholders as to the distribution of the proceeds of the proposed sale. . . ." Defendant did not respond to this question; he simply "indicated that a lack of response did not imply that he agreed with Mr. or Mrs. Parker." There was no further discussion and, when the measure was called for a vote, the Parkers abstained and the resolution passed with approval of the remaining seven members of the corporation's board of directors, including at least two directors who had no financial interest in the corporation. The meeting of the board of directors then adjourned and a meeting of the corporation's stockholders was called. When the asset sale agreement was brought to the floor for a vote, the measure was unanimously approved by defendant's side of the family (then holding 52 percent of the vote) and disapproved by plaintiffs.

After the asset sale to Eckerd Drugs closed on June 12, 1989, plaintiffs discovered cancelled checks (amongst the corporation's business records) payable to defendant in amounts exceeding $2,000,000. These checks were issued during the defendant's long term as president of the corporation and included hundreds of thousands of dollars payable to defendant after W. H. Dunaway died in 1987. Defendant attributed (at trial) these cancelled checks to reimbursements for loans he made to the corporation and the corporation's bookkeeper backed up this claim, broadly attributing the cancelled checks to either loans or rental payments. However, when asked why the corporation's accounting records do not support these explanations, the corporation's bookkeeper explained that he could not find the relevant

corporate records. Defendant explained, "I did not keep [such] records."

The jury returned a general verdict in favor of plaintiffs in the amount of $350,000 and specified that punitive damages were not a part of their award. This appeal followed the denial of defendant's motion for judgment n.o.v. and for a new trial. *Held:*

1. Defendant first challenges the denial of his motions for directed verdict and for judgment n.o.v., arguing the trial court should not have allowed plaintiffs' direct claim to proceed alternatively with their stockholder's derivative claim since all of the corporation's stockholders are not parties to the suit. In this vein, defendant points out that his spouse, children and possibly his mother own a substantial percentage of the corporate stock, but that they are not parties to this action.

" 'A pretrial order "limits the issues for trial to those not disposed of by admissions or agreements of counsel. The order, when entered, controls the subsequent course of the action unless modified at the trial to prevent manifest injustice." OCGA § 9-11-16 (b). " 'If a claim or issue is omitted from the order, it is waived.' " *Ga. Power Co. v. O'Bryant,* 169 Ga. App. [491, 495 (313 SE2d 709)].' *John H. Smith, Inc. v. Teveit,* 175 Ga. App. 565, 566 (333 SE2d 856) (1985)." *Long v. Marion,* 257 Ga. 431, 432 (2), 433 (360 SE2d 255). In the case sub judice, defendant did not raise the propriety of the plaintiffs' direct action in the pretrial order and our examination of the record (parts of which were apparently not designated for inclusion in the record on appeal) reveals that this issue was not raised until defendant asserted a motion for directed verdict after the close of evidence. However, we are reluctant to dismiss summarily the issue regarding the propriety of plaintiffs' direct action since interests other than those of defendant are at stake, i.e., the rights of corporate creditors and possibly shareholders not parties to this action.

"The general rule is that a shareholder seeking to recover misappropriated corporate funds may only bring a derivative suit. The reasons underlying this general rule are that 1) it prevents a multiplicity of lawsuits by shareholders; 2) it protects corporate creditors by putting the proceeds of the recovery back in the corporation; 3) it protects the interests of all shareholders by increasing the value of their shares, instead of allowing a recovery by one shareholder to prejudice the rights of others not party to the suit; and 4) it adequately compensates the injured shareholder by increasing the value of his shares. If there exists the possibility of prejudice to other interested parties, such as creditors or other shareholders, a direct recovery should not be allowed. *Thomas v. Dickson,* 250 Ga. 772 (301 SE2d 49) (1983)." *Medlin v. Carpenter,* 174 Ga. App. 50, 53 (3) (329 SE2d 159). However, a direct action is permissible when such prejudice is unlikely

and the "realistic objectives" of avoiding unfair access or distribution of corporate assets (committed or derived as a result of litigation) to one side over the other are more effectively accomplished via a direct action. See *Thomas v. Dickson*, 250 Ga. 772, 774, supra.

In the case sub judice, defendant's failure to place the propriety of plaintiffs' direct claim on the table before the close of evidence leaves an unfocused evidentiary record as to the factors relevant to deciding this issue. However, evidence adduced at the five-day jury trial paints a fairly complete picture of the corporation's current financial status and the posture of the non-party shareholders. In this vein, we observe that all matters of corporate debt appear to have been resolved upon execution and disbursement of the asset sale agreement and that, as a result, no creditor appears to be in need of protection. Further, there was ample evidence adduced at trial for the jury to determine the amount plaintiffs would be entitled to recover for any devaluation of corporate assets (due to defendant's wrongful acts) based on their combined percentage of corporate ownership. To this extent, we note that the trial court fully charged the jury as to the different rights of recovery under plaintiffs' alternative claims and instructed the jury that, should they elect to award damages under plaintiffs' direct claim, damages are to be apportioned "according to their percentage ownership of the corporation as [the jury] finds it to be. . . ." The jury appears to have followed this directive, considered the relevant evidence and thus properly apportioned damages so as to protect the fractional interests of all stockholders of the corporation. This conclusion is supported by observation that the jury's $350,000 verdict was less than 37 percent (the percentage of stock defendant contends plaintiffs own) of the amount offered as proof of the corporation's loss due to defendant's alleged acts of corporate mismanagement and self-dealing. Finally, it is unlikely that other stockholder lawsuits will flow from the acts which form the basis of the case sub judice as the only shareholders not a party to this action are defendant's wife and children and possibly his mother.[2] These stockholders never complained of defendant's actions in managing the corporation and they fully supported defendant's resolution to sell virtually all assets of the corporation to Eckerd Drugs. Under these circumstances, we find that the jury was properly allowed to consider plaintiffs' alternative claim for direct relief against defendant. See Wade H. Watson

---

[2] There is evidence that Lanore Dunaway equally gifted her ten percent share of the corporation to defendant and Joyce D. Parker after the death of her husband; thus, indicating that she no longer has standing to bring an action against her son for corporate mismanagement and self-dealing. Moreover, it appears that both defendant and Joyce D. Parker agreed not to involve their elderly mother in any dispute arising from their on-going rivalry. The wisdom of this mutual agreement appears to be supported by the prayerful introduction offered by Lanore Dunaway at the last meeting of the corporation's board of directors.

III's and J. Bertram Levy's article, "The Development of the Shareholder's Direct Action Damage Remedy," 28 Georgia State Bar Journal 195 (1992).

2. In his second enumeration, defendant contends the trial court erred in denying his motions for directed verdict and for judgment n.o.v., arguing that he is insulated from liability because the asset sale agreement was approved by a majority of the corporation's board of directors, including three members of the board of directors who had no financial stake in the transaction. This contention is without merit.

OCGA § 14-2-861 (b) (1) provides that "[a] director's conflicting interest transaction may not . . . give rise to an award of damages or other sanctions, in an action by a shareholder or by or in the right of the corporation, on the ground of an interest in the transaction of the director . . . if [the directors'] action respecting the transaction was at ·any time taken in compliance with Code Section 14-2-862." This Code section provides (in pertinent part) that "[d]irectors' action respecting a [conflicting interest transaction] is effective . . . if the transaction received the affirmative vote of a majority (but not less than two) of those qualified directors on the board of directors . . . who voted on the transaction after . . . required disclosure to them (to the extent the information was not known by them). . . ." OCGA § 14-2-862 (a). " 'Required disclosure' means disclosure by the director who has a conflicting interest of (A) the existence and nature of his conflicting interest, and (B) all facts known to him respecting the subject matter of the transaction that an ordinarily prudent person would reasonably believe to be material to a judgment as to whether or not to proceed with the transaction." OCGA § 14-2-860 (4).[3]

Although defendant provided the Parkers with a copy of the asset sale agreement three weeks before the meeting of the board of directors, he never directly informed the Parkers or the other corporate directors of the existence, extent and nature of his conflicting interests while acting as the corporation's negotiator during his secret talks with Eckerd Drugs as required by OCGA § 14-2-860 (4) (A). In

---

[3] Although defendant cites a repealed provision of Georgia's Business Corporation Code (former OCGA § 14-2-155 (a)) in support of this enumeration because it was effective at the time of the transaction which forms the basis of the case sub judice, we rely on new provisions of Georgia's Business Corporation Code since " '(a) person has no vested right in statutory privileges and exemptions.' [(Emphasis omitted.)] *Fulton Bag &c. Mills v. Williams*, 212 Ga. 783 (1) (95 SE2d 848); *Goolsby v. Regents of Univ. System*, 141 Ga. App. 605, 607 (1) (234 SE2d 165)." *Evans v. Belth*, 193 Ga. App. 757, 758 (388 SE2d 914). See *Hensel Phelps Constr. Co. v. Johnson*, 161 Ga. App. 631, 632 (295 SE2d 843), rev'd on other grounds, *Johnson v. Hensel Phelps Constr. Co.*, 250 Ga. 83 (295 SE2d 841). However, assuming the contrary, the pertinent language of former OCGA § 14-2-155 (a) is the same as the pertinent language of new provisions of Georgia's Business Corporation Code and the same analysis applies.

fact, when Joyce D. Parker (acting in her capacity as a member of the board of directors) asked how modification of the warehouse and Marietta Store leases affected the corporation, defendant responded "that the overall term of the Warehouse lease would be reduced by 7½ years and that the total obligation would be less [and] B. B. Dunaway stressed that the rent increases did not apply to the Company, but had been written into the leases only for possible future use." These responses deceptively failed to disclose that increasing the rent and otherwise modifying the warehouse and Marietta Store leases actually decreased the perceived value of the corporation's leasehold estates, prompting Eckerd Drugs to view the leases (once favorable assets because of below market rental rates) as liabilities to the corporation. Further, defendant did not disclose that the covenant not to compete he negotiated for himself (in exchange for $300,000 plus a car owned by the corporation) was actually a valuable corporate asset for which the corporation received nothing. "When a noncompetition agreement ancillary to the sale of a business does not also require the seller to affirmatively provide services to the buyer, the essential benefit the buyer is purchasing is the business's good will (as opposed to the seller's expertise), see *Redmond v. Royal Ford*, 244 Ga. 711, 713 (261 SE2d 585)." *Mail & Media v. Rotenberry*, 213 Ga. App. 826 (1), 827 (446 SE2d 517). Consequently, since it is undisputed that these undisclosed facts were known to defendant at the time he proposed approval of the asset sale agreement and since we find that any ordinarily prudent person would reasonably believe these undisclosed facts would have been material to the decision to go through with the asset sale agreement, the jury was authorized in rejecting the defense provided in OCGA §§ 14-2-861 (b) (1) and 14-2-862 (a). See Volume 3A, Fletcher Cyclopedia of the Law of Private Corporations, p. 37, § 1036; p. 50, § 1040.

3. Next, defendant contends the trial court erred in denying his motions for directed verdict and for judgment n.o.v., arguing that plaintiffs Joyce D. Parker and A. Sidney Parker, "in their capacities as members of the Board of Directors of the corporation, abstained from the Board vote on the transactions complained of, and such abstention, as a matter of law, was equivalent to their *assent* to those transactions." We disagree.

"It is well-recognized that 'shareholders in a corporation who participate in the performance of an act, or who acquiesce and ratify the same, are estopped to complain thereof. . . .' *Pickett v. Paine*, 230 Ga. 786 (2) (199 SE2d 223); *Medlin v. Carpenter*, 174 Ga. App. 50 (2) (329 SE2d 159). This rule presupposes that any act or acquiescence is voluntary[, i.e., with full knowledge of all facts relevant to the alleged act of acquiescence]. 'The benefit of all reasonable inferences and all reasonable doubts must be [weighed in favor of the verdict

upon motions for directed verdict and judgment n.o.v. *Roswell Properties v. Salle*, 208 Ga. App. 202, 203 (3) (430 SE2d 404)]. For estoppel to govern [the case sub judice], it must exist as a matter of law. ' "(W)here the facts relied on to establish the estoppel do not unequivocally show an estoppel in pais, the jury, and not the judge, should determine whether the facts constitute such an estoppel." (Cit.) "Estoppel is usually an issue of fact to be decided by the jury." ' *Eiberger v. West*, 247 Ga. 767 (1a) (281 SE2d 148); see *Bloodworth v. Bloodworth*, 225 Ga. 379 (1) (169 SE2d 150). We are satisfied that the [issue] of estoppel raised [by defendant in the case sub judice was] properly . . . decided by the jury. Cf., *Elwell v. Nesmith*, 246 Ga. 430 (2) (271 SE2d 827); *Bloodworth*, supra." *Marshall v. W. E. Marshall Co.*, 189 Ga. App. 510, 511 (2) (376 SE2d 393). This conclusion is supported by evidence that plaintiffs were deliberately excluded from all sale negotiations with Eckerd Drugs preceding their decision to abstain from voting on the asset sale agreement; that defendant failed to fully disclose and explain the extent of his conflicting interests before the asset sale agreement was brought to a vote; that defendant failed to inform Joyce D. Parker and A. Sidney Parker of his manipulation of corporate assets (i.e., the warehouse and Marietta Store leases) before entering into secret negotiations with Eckerd Drugs and that defendant failed to accurately respond to Joyce D. Parker's question regarding how amendment of these leases affected the corporation.

4. In his fourth enumeration, defendant challenges denial of his motions for directed verdict and for judgment n.o.v., arguing that there was "a complete failure of proof of any breach of duty or any harm to the corporation with respect to the features of the Eckerd transactions. . . ." This contention is without merit.

"When considering whether the trial court erred by denying motions for directed verdicts and motions for judgment n.o.v., we review and resolve the evidence and any doubts or ambiguities in favor of the verdict; directed verdicts and judgments n.o.v. are not proper unless there is no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions therefrom demands a certain verdict. *Southern Store &c. Co. v. Maddox*, 195 Ga. App. 2, 3 (392 SE2d 268). Thus, a judgment n.o.v. may be granted only when, without weighing the credibility of the evidence, there can be but one reasonable conclusion as to the proper judgment. If the evidence is conflicting, or if insufficient evidence exists to make a 'one-way' verdict proper, judgment n.o.v. should not be granted. Further, when considering these motions, trial and appellate courts must view the evidence in the light most favorable to the party securing the jury verdict. *Denson v. City of Atlanta*, 202 Ga. App. 325, 326 (414 SE2d 312)." *Roswell Properties v. Salle*, 208 Ga. App. 202, 203 (3),

supra. In the case sub judice, there was evidence that defendant engaged in self-dealing and manipulation while negotiating the asset sale agreement on behalf of the corporation and that defendant's wrongful conduct actually resulted in devaluation of the corporate assets sold to Eckerd Drugs.

5. In his final enumeration, defendant contends the trial court erred in denying his motions for directed verdict and for judgment n.o.v., arguing that plaintiffs failed to provide a pre-suit demand to support their alternative derivative action as required by OCGA § 14-2-742; that plaintiffs failed to plead any breach of fiduciary duty outside defendant's activities in negotiating the asset sale agreement with Eckerd Drugs and that there was no evidence that defendant breached fiduciary duties (apparently) by siphoning funds from the corporation under the guise of repayment of corporate loans. These contentions are without merit.

First, the issue of providing a pre-suit demand is moot since the jury returned a verdict on plaintiffs' direct action. Second, a primary issue for trial asserted by plaintiffs in the pre-trial order was that defendant committed acts of corporate self-dealing and mismanagement outside the transaction involving sale of the corporate assets. Third, there was evidence that hundreds of thousands of dollars were tendered to defendant via the corporate checks with no corresponding record that these payments represented legitimate loan transactions between defendant and the corporation. This evidence was sufficient to authorize a finding that at least some of these payments were inappropriately directed to defendant. See OCGA § 24-4-22; *J. B. Hunt Transport v. Bentley*, 207 Ga. App. 250, 256 (3) (427 SE2d 499).

The trial court did not err in denying defendant's motions for directed verdict and for judgment n.o.v.

*Judgment affirmed. Beasley, P. J., and Smith, J., concur. Pope, C. J., disqualified.*

DECIDED DECEMBER 5, 1994 —
RECONSIDERATION DENIED DECEMBER 20, 1994 — 

*Rogers & Hardin, C. B. Rogers, John J. Almond,* for appellant.
*Barnes, Browning, Tanksley & Casurella, Roy E. Barnes, Jeffrey G. Casurella,* for appellees.