## A99A0626, A99A0627. PARKS v. MULTIMEDIA TECHNOLOGIES, INC. et al.; and vice versa.
### (520 SE2d 517)

RUFFIN, Judge.

These cases are cross-appeals following the trial court's decisions on motions for summary judgment. For reasons that follow, we affirm in part and reverse in part the rulings below.

Around 1991, Beverly Sigmond Parks conceived the idea of placing outdoor advertising on the roof of the MONY building at 1655 Peachtree Street in Atlanta. Parks met with a representative of JMB

Investment Corporation (JMB), the owner of the building, to negotiate the right to use the space. In January 1992, Parks entered into an agreement with JMB granting him[1] a six-month option to lease the rooftop for five years at a fixed price.

Parks approached Taz L. Anderson, Jr. in an effort to obtain support for the venture. Parks assigned to Signage Consultants, L.P., a partnership controlled by Anderson,[2] an option to acquire a 50 percent interest in his MONY rooftop lease option. Parks and Anderson then formed a new entity, Signage Technology, Inc. (STI), whose shares were owned 50 percent by Parks and 50 percent by Anderson's wife and children. Parks was President of STI, Anderson was Treasurer, and both served as directors. Parks and Anderson assigned to STI their respective rights to the MONY lease option, and STI entered into two leases with JMB for space on the roof of the MONY building, as well as office space inside the building. STI later entered into a third lease with JMB for advertising space on the north exterior wall of the MONY building.

Parks claims that, as part of their business arrangement, Anderson agreed to "provide the necessary start-up funds for the enterprise through the time that the [project] began to generate income." Anderson disagrees, asserting that the parties' only financing agreement is contained in a written contract dated January 10, 1992, under which Anderson agreed to pay "the normal expenses" to "secure a permit to erect" an advertising sign on the MONY roof. The contract specifies no further obligations on the part of Anderson. Over the next 11 months, however, Anderson invested almost $100,000 of his money in STI.

After securing the leases, Parks and Anderson began working to obtain permits, install a sign, and find advertisers. Anderson claims that Parks' original idea for expanding existing signage on the rooftop was unworkable and that potential advertisers demanded a larger sign. Accordingly, Anderson hired architects to design a new concept for the MONY rooftop called the "Peachtree Spectacular," a large, peach-shaped structure that sits atop a three-sided signboard. Anderson paid the architects with checks drawn on STI's account. Because of the delay associated with implementing the new design, Anderson negotiated an amendment of the rooftop lease with JMB, under which STI would pay a monthly extension fee of $1,000 until it received a permit to build the new sign, at which point it would resume regular lease payments. In January 1993, the City of Atlanta

---

[1] Parks was using the name Systems Technology, Inc., a business entity he formed but never incorporated.

[2] Anderson serves as both the general partner and a limited partner of Signage Consultants, and he owns 97 percent of the business.

awarded STI the requisite permits. In early February 1993, STI made a $1,000 rental payment to Jalex Investment & Development Corporation (Jalex), the manager of the MONY building. On February 18, 1993, Jalex notified STI that it was in default under the leases.[3] No further payment was made. On March 4, 1993, Jalex notified STI that the leases were terminated. The next day, JMB entered into new leases for space at the MONY building with Multimedia Technologies, Inc. (Multimedia), a corporation recently formed and controlled by Anderson.[4] According to Parks, Multimedia went on to enter into lucrative advertising contracts for the MONY rooftop and north wall. Multimedia also arranged for the construction of a similar peach sign atop the IBEW building in Atlanta and is profiting from rental of that advertising space.

Parks asserts that Anderson embarked on a deliberate campaign to force him out of the enterprise. He claims that Anderson neither consulted him nor obtained his approval to develop the peach design, obtain the building permit for it, or hire the architects, as required by the STI shareholder agreement. Parks asserts that the development of the peach sign was unnecessary to attract advertisers. According to Parks, Anderson marketed STI's MONY peach design for use on other buildings on behalf of Signage Consultants, Multimedia, and Taz L. Anderson Realty Company (Realty Company), another entity controlled by Anderson.[5] Parks charges that Anderson induced the architects to copyright the drawings for the "Peachtree Spectacular" design in the name of Multimedia, rather than STI.

Parks further claims that Anderson "orchestrated a bogus default" of the MONY leases by deliberately failing to make sufficient payments, even though STI had the funds to do so. According to Parks, when he learned the leases were in default, he demanded to see STI's corporate and financial records, but Anderson would not produce them. Parks claims that Anderson did not consult him about the default and did not notify him of the termination of the leases until March 10, 1993 — after Multimedia had already entered into new leases with JMB. Finally, Parks asserts that Multimedia's use of the peach design on the MONY and IBEW buildings constitutes misappropriation of STI's corporate resources.

Anderson's version of events is quite different. He claims that he expended considerable resources to bring the MONY project to fruition and that Parks' involvement was minimal. Anderson does not

---

[3] The receipt of the building permit triggered STI's normal obligations under the rooftop lease, but STI's February payment was at the reduced rate.

[4] Anderson is the President of Multimedia, and his wife and children own the company's stock.

[5] Anderson owns all the stock of the Realty Company and serves as its President.

deny that he failed to seek Parks' approval for changing the sign concept, hiring the architects, or getting the permits, but he contends that Parks was unavailable for consultation on important decisions. As to the rooftop and office space leases, Anderson asserts that Parks was obligated for half of the rent, but contributed nothing. Eventually, Anderson grew tired of paying Parks' portion of the bill, so he allowed STI to slip into default on the leases. Anderson claims he promptly notified Parks of the default, but Parks did nothing. Anderson also insists that his arrangement with Parks was limited to developing signage at the MONY building, that he and Parks never discussed forming a business venture relative to any other location, and that both were free to pursue other business interests. Thus, Anderson denies that he or the entities controlled by him misappropriated assets of STI.

Finally, Anderson contends that after his business relationship with Parks soured, Parks made defamatory statements accusing Anderson of stealing STI's corporate resources and engaging in other tortious behavior. According to Anderson, these statements resulted in a third party canceling two leases with Multimedia.

Anderson and Multimedia sued Parks for defamation and tortious interference with contract. Parks filed a multi-count amended counterclaim against Anderson, Multimedia, Signage Consultants, and the Realty Company.[6] Among other allegations, Parks claimed that Anderson breached his fiduciary duties to STI and violated the STI shareholder agreement and that Anderson and the entities controlled by him — Multimedia, Signage Consultants, and the Realty Company (hereinafter "the Anderson parties") — misappropriated STI's corporate assets, converted those assets, defrauded Parks, and tortiously interfered with the MONY leases and STI's ongoing business. Parks sought punitive and other damages and attorney fees.

Parks filed a motion for partial summary judgment on the defamation claim, and the Anderson parties filed a motion for summary judgment on the counts alleged in Parks' counterclaim. In an order dated May 30, 1997, the trial court granted in part and denied in part both motions. As a result of the trial court's order, part of the defamation claim remains in the case, as well as the counterclaims listed above to the extent they were asserted against Anderson.

## Case No. A99A0627

1. The Anderson parties contend that the trial court erred in

---

[6] The amended counterclaim also alleged claims against Jalex, JMB, and a representative thereof. The trial court granted summary judgment to those parties, and Parks has not appealed that ruling.

allowing Parks to file a late counterclaim. Parks filed his answer pro se, without a counterclaim. Two and one-half months later, after obtaining counsel, Parks filed an amended answer and counterclaim against Anderson and Multimedia.[7] Thereafter, Parks sought leave of court to add the counterclaim, and Anderson and Multimedia moved to dismiss it. The trial court allowed the counterclaim, noting that Parks filed it within a short time after the answer and that Anderson and Multimedia had notice of it and were not prejudiced by the late filing.

Under OCGA § 9-11-13 (f), "[w]hen a pleader fails to set up a counterclaim through oversight, inadvertence, or excusable neglect, or when justice requires, he may by leave of court set up the counterclaim by amendment." The decision to grant or deny leave to amend is " 'totally within the trial court's discretion,' " *Kelly v. Pierce Roofing Co.*, 220 Ga. App. 391, 393 (3) (469 SE2d 469) (1996), and the court "should be liberal in allowing [amendment] where no prejudice would result." *Martin & Jones Produce v. Lundy*, 197 Ga. App. 38, 39 (2) (397 SE2d 461) (1990). We find no abuse of discretion here. Id.

2. The Anderson parties sought summary judgment on Parks' counterclaims for misappropriation and conversion of STI assets, breach of fiduciary duty, and tortious interference with contract, arguing that those claims are derivative of STI and that Parks lacks standing to pursue them directly. The trial court ruled that Parks has standing to pursue his counterclaims against Anderson individually, but does not have standing to pursue counterclaims against the Anderson-related business entities. Anderson enumerates as error the trial court's failure to dismiss the claims against him for lack of standing. We conclude that the trial court did not err.

To prevail on a motion for summary judgment, "the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law. OCGA § 9-11-56 (c)." *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991). The moving party may carry this burden either by (1) presenting evidence negating an essential element of the nonmoving party's claim, "i.e., affirmatively disproving the element with evidence which makes it *impossible* for the [nonmoving party] to prove the element at trial"; or (2) demonstrating an absence of evidence to support an essential element of the nonmoving party's claim. *Garrett v. NationsBank, N.A. (South)*, 228 Ga. App. 114, 115 (491 SE2d 158) (1997). "If the moving party discharges this burden, the nonmoving party can-

---

[7] Parks later sought and obtained leave to further amend the counterclaim, adding new counterclaim defendants. These later amendments are not at issue on appeal.

not rest on its pleadings, but rather must point to specific evidence giving rise to a triable issue. OCGA § 9-11-56 (e)." *Lau's Corp.*, supra. On appeal, we review de novo the trial court's ruling on a motion for summary judgment, construing all facts and reasonable inferences therefrom in the light most favorable to the nonmovant. *Durben v. American Materials*, 232 Ga. App. 750 (503 SE2d 618) (1998).

As the trial court noted, the crux of Parks' counterclaims against Anderson is that he misappropriated assets belonging to STI. Generally, a shareholder must bring an action alleging misappropriation of corporate assets in a derivative suit on behalf of the corporation. *Thomas v. Dickson*, 250 Ga. 772, 774 (301 SE2d 49) (1983); OCGA § 14-2-831 (a) (1) (C). The reasons for requiring a derivative suit are as follows:

> 1) it prevents a multiplicity of lawsuits by shareholders; 2) it protects corporate creditors by putting the proceeds of the recovery back in the corporation; 3) it protects the interests of all shareholders by increasing the value of their shares, instead of allowing a recovery by one shareholder to prejudice the rights of others not a party to the suit; and 4) it adequately compensates the injured shareholder by increasing the value of his shares.

Id. Also, a direct recovery should not be allowed "if there exists the possibility of prejudice to other interested parties, such as creditors or other shareholders." *Dunaway v. Parker*, 215 Ga. App. 841, 845 (1) (453 SE2d 43) (1994). However, a shareholder may bring a direct action if the reasons for requiring a derivative suit are absent and if "prejudice is unlikely and the 'realistic objectives' of avoiding unfair access or distribution of corporate assets (committed or derived as a result of litigation) to one side over the other are more effectively accomplished via a direct action." (Citation omitted.) Id. at 845-846; see also *Thomas*, supra.

Applying these principles, we agree with the trial court that Parks may maintain a direct action against Anderson for misappropriation of STI's assets because the reasons for requiring a derivative action are absent here. First, STI is a closely held corporation whose only shareholders are Parks and members of Anderson's immediate family. Nothing in the record suggests that Anderson's family members have complained about his management of STI. Thus, "it is unlikely that other stockholder lawsuits will flow from the acts which form the basis of the case sub judice." *Dunaway*, supra at 846 (noting that only other shareholders were defendant's wife, children, and mother). Second, a derivative suit is not needed to protect creditors. Anderson suggests that Jalex and JMB could seek past due rent from

STI. However, there is no evidence that Jalex and JMB have made a claim for such payments during the period of more than six years that has elapsed since the termination of the leases, or that any other creditors have come forward. Any concern about prejudice to creditors is entirely remote and speculative. See *Thomas*, supra at 775. Third, as in *Thomas*, the only injured shareholder in this case is Parks. Thus, there is no concern about prejudicing other shareholders by excluding them from participating in any recovery by Parks. *Caswell v. Jordan*, 184 Ga. App. 755, 758 (1) (362 SE2d 769) (1987). Finally, Parks would not be adequately compensated by an increase in the value of STI's shares that could result from a derivative recovery because "in a closely held corporation, there is no ready market for [his] shares." *Thomas*, supra. Accordingly, we affirm the trial court's ruling that Parks has standing to pursue direct claims against Anderson for breach of fiduciary duty, misappropriation of corporate opportunities, conversion, and tortious interference.

3. In several enumerations of error, the Anderson parties challenge the trial court's denial of their motion for summary judgment on the merits of specific counts of Parks' counterclaim.[8]

(a) First, the Anderson parties claim that the trial court should have granted their motions for summary judgment on Parks' corporate misappropriation claim. We disagree as to the claims against Anderson.[9] An officer or director of a corporation may be held liable for "[t]he appropriation, in violation of his duties, of any business opportunity of the corporation." OCGA § 14-2-831 (a) (1) (C). Accordingly,

> [i]f there is presented to a corporate officer or director a business opportunity *which the corporation is financially able to undertake*, is, from its nature, in the line of the corporation's business and is of practical advantage to it, is one in which

---

[8] All of the Anderson parties sought summary judgment on all counts of Parks' counterclaim. Since the trial court ruled that Parks lacked standing to sue the Anderson business entities, the trial court did not consider the other summary judgment arguments of those parties. On appeal, only Anderson, individually, has enumerated as error the trial court's failure to grant summary judgment on the merits of various counts of Parks' counterclaim. As the Anderson business entities have been dismissed, they have not joined in these enumerations of error and could not have done so. However, our decision infra that the trial court wrongly decided that Parks lacked standing to sue the Anderson business entities effectively brings those entities back into the case. Because those parties' other arguments for summary judgment were fully briefed and submitted for the trial court's consideration, and because we must affirm the trial court's grant of summary judgment if it is right for any reason, we will consider the summary judgment arguments of the Anderson parties that were presented but not decided below.

[9] As discussed infra in Division 5, we conclude for other reasons that Parks may not bring a corporate misappropriation claim against Multimedia, Signage Consultants, and the Realty Company.

the corporation has an interest or a reasonable expectancy, and, by embracing the opportunity, the self-interest of the officer or director will be brought into conflict with that of his corporation, the law will not permit him to seize the opportunity for himself.

(Punctuation omitted; emphasis supplied.) *Quinn v. Cardiovascular Physicians, P.C.*, 254 Ga. 216, 218 (3) (326 SE2d 460) (1985); see also *Southeast Consultants v. McCrary Engineering Corp.*, 246 Ga. 503, 507-509 (2) (273 SE2d 112) (1980).

On appeal, Anderson does not contest that he took advantage of STI's business opportunities. Rather, he claims that STI was not financially able to undertake those opportunities because it was insolvent. Anderson provides no citations to the record to support his argument, but simply asserts that STI was "insolvent." Parks argues that at the time STI defaulted on the MONY leases, it had enough money in the bank to pay the rent, and that Anderson is to blame for any depletion of STI's funds because he wrote checks on STI's account totaling $59,693.59 in the weeks leading up to the default, knowing that the rent payment was due. Anderson responds that even if STI could have made the initial rent payment, the company lacked sufficient funds for ongoing viability.

There is no question that STI had *some* funds when it defaulted on the leases. However, the parties disagree as to the nature of STI's business opportunities, the resources STI needed to pursue them, and the reasons for the depletion of STI's funds. As the record is poorly developed on these points and Anderson provides no citation to support his factual contentions, we agree with the trial court that summary judgment on the merits of the corporate misappropriation claim is inappropriate. See *Grove v. Sugar Hill Investment Assoc.*, 219 Ga. App. 781, 787 (4) (466 SE2d 901) (1995).

(b) Anderson asserts that he was entitled to summary judgment on Parks' breach of fiduciary duty claim. We disagree. Georgia law requires that officers and directors discharge their duties with due care in a manner they believe in good faith to be in the best interests of the corporation. OCGA §§ 14-2-830 (a); 14-2-842 (a); *Quinn*, supra at 217-218 (2). "A fiduciary's duty of good faith prohibits him from appropriating for himself the assets and property of the corporation, to the exclusion of minority shareholders." Id. at 219 (4). Anderson argues that he did not violate any fiduciary duty by declining to advance personal funds to STI. As the trial court correctly observed, however, Parks' claim is not limited to Anderson's alleged failure to fund STI, and Anderson makes no other argument for summary judgment, nor does he provide any citation to the record. We there-

fore affirm the trial court's denial of summary judgment on this claim.

(c) Anderson maintains that the trial court erred in denying summary judgment on Parks' claim that Anderson breached the STI shareholder agreement by "failing and refusing to make joint decisions on the management and operations of STI with Parks." Anderson insists that joint decision making was impossible because Parks was unavailable throughout most of 1992. Anderson testified during his deposition that he could not reach Parks to discuss important matters. Anderson also testified, however, that Parks called him six to eight times a day from February through September 1992, and that Anderson finally instructed his secretary to tell Parks that he was out. This self-contradictory testimony must be construed against Anderson and precludes the entry of summary judgment in his favor. *City Council of Augusta v. Booker*, 229 Ga. App. 566, 567 (2) (494 SE2d 374) (1997).

(d) The Anderson parties claim error in the denial of their motion for summary judgment on Parks' claim of converting corporate assets. They provide no citations to the record or to authority, and they make no argument other than to assert that "[t]he record contains no evidence of the conversion of any assets of the appellants," which is simply a rephrasing of the enumeration of error. Conversion is the unauthorized assumption and exercise of ownership over the personalty of another, including a corporation, contrary to the owner's rights. *Pelletier v. Schultz*, 157 Ga. App. 64, 65 (3) (a) (276 SE2d 118) (1981). Contrary to the assertions of the Anderson parties, the record does contain evidence that they converted assets of STI, including the MONY leases and the copyrights to the peach design, and that he used Multimedia, Signage Consultants, and the Realty Company to do so. The trial court therefore properly denied summary judgment on the conversion claim. *Lau's Corp.*, supra.

(e) The Anderson parties claim that the trial court should have granted summary judgment in their favor on Parks' claim for fraud and deceit. The tort of fraud has five elements: (1) a false representation or omission of a material fact; (2) scienter; (3) intention to induce the party claiming fraud to act or refrain from acting; (4) justifiable reliance; and (5) damages. *Klusack v. Ward*, 234 Ga. App. 178, 179 (1) (507 SE2d 1) (1998); *Smalls v. Blueprint Dev.*, 230 Ga. App. 556, 559 (1) (497 SE2d 54). To survive summary judgment, Parks was required to show some evidence as to each of these elements. *Hanlon v. Thornton*, 218 Ga. App. 500, 501 (1) (462 SE2d 154) (1995). The trial court denied summary judgment to Anderson on the ground that Parks was not required to identify an affirmative misrepresentation in order to prove fraud. We agree with the trial court. See *KHD Deutz of America Corp. v. Utica Mut. Ins. Co.*, 220 Ga. App. 194,

197 (2) (469 SE2d 336) (1996) ("The absence of any affirmative misrepresentation does not indicate the absence of fraud; 'the suppression of truth is as false and fraudulent as a wilful misrepresentation.' ").

Moreover, in their briefs to this Court, the Anderson parties provide no citations to the record and make no argument other than to assert that there was no evidence of fraud and that the complaint did not properly allege fraud.[10] Each enumeration of error must be supported by specific references to the record, and unsupported enumerations may be treated as abandoned. Court of Appeals Rules 27 (c) (2) and (3) (i). Although the Anderson parties contend that there was no evidence of fraud, they must at least place their argument in some factual context, rather than simply asserting that there was a failure of proof. We will not cull the record looking for support for their argument, particularly in a case such as this where the record is quite voluminous. *Rolleston v. Cherry*, 226 Ga. App. 750, 753 (1) (b) (487 SE2d 354) (1997). Accordingly, we affirm the trial court's denial of summary judgment on the fraud counterclaim.

(f) The Anderson parties assert that they should have been awarded summary judgment on Parks' claim that they "tortiously interfered with the ongoing business relationships among" Parks, STI, Jalex and JMB. With the exception of the claim against Multimedia, we agree. A claim of tortious interference with business relations requires proof that the Anderson parties acted improperly, without privilege, and with intent to induce a third party or parties not to enter into or continue a business relationship with Parks, causing injury to Parks. *Renden, Inc. v. Liberty Real Estate &c.*, 213 Ga. App. 333, 334 (2) (444 SE2d 814) (1994). "[I]n order for a defendant to be liable for tortious interference with contractual relations, [one] must be a stranger to both the contract and the business relationship giving rise to and underpinning the contract." *Atlanta Market Center Mgmt. Co. v. McLane*, 269 Ga. 604, 609 (2) (503 SE2d 278) (1998). This principle also applies to claims asserting tortious interference with business relations. Id. at 609, n. 2. Anderson sought summary judgment on the ground that, as an officer and director of STI, he was not a stranger to STI's MONY lease agreements. The trial court disagreed, finding an issue of fact as to whether Anderson "stepped outside his role as a corporate officer and interfered with [STI's] contractual relations."

---

[10] In his reply brief, Anderson argues that Parks failed to present any evidence of reliance, an essential element of fraud. See *Klusack v. Ward*, supra. However, Anderson cannot raise this argument for the first time in a reply brief, and we therefore will not consider it on appeal. See *Ga. Osteopathic Hosp. v. O'Neal*, 198 Ga. App. 770, 780 (14) (403 SE2d 235) (1991).

Decisions of this Court have suggested that a corporate officer may be liable for interfering with a contract of the corporation if the officer disregarded the corporate entity or acted outside the scope of his agency or in derogation of the corporation. *Energy Contractors v. Ga. Metal Systems &c.*, 186 Ga. App. 475, 478 (4) (367 SE2d 324) (1988); *Barnwell v. Barnett & Co.*, 222 Ga. App. 694, 695 (1) (476 SE2d 1) (1996). Pretermitting whether Anderson was acting as an agent of STI when he took the actions alleged by Parks, it is clear that Anderson was not a stranger to the business relationship between STI and Jalex and JMB. Prior to engaging in the alleged tortious conduct, for example, Anderson negotiated with Jalex and JMB for a modification of the MONY lease agreements on behalf of STI. Mindful of the Supreme Court's recent suggestion that we "reduce the number of entities against which a claim of tortious interference with contract may be maintained," *Atlanta Market*, supra at 610, we conclude that Anderson was not a stranger to the business relationship at issue and therefore cannot be held liable for tortious interference with STI's lease agreements. Thus, the trial court erred in denying summary judgment to Anderson.

Multimedia, however, was indisputably a stranger to the contracts and business relationship between STI and Jalex/JMB. Multimedia argues that any interference on its part was necessarily limited to the short period of time between its incorporation on February 16, 1993, and the termination of STI's leases on March 4, 1993. Multimedia cites no authority for the proposition that tortious interference cannot be accomplished within a two-week period, however. Parks has presented sufficient evidence to raise a jury question as to whether Multimedia's negotiation with Jalex and JMB of lease agreements for space at the MONY building tortiously interfered with STI's contracts with Jalex and JMB. Accordingly, Multimedia is not entitled to summary judgment on this claim. See *Phillips v. MacDougald*, 219 Ga. App. 152, 154 (2) (b) (464 SE2d 390) (1995).

We agree with the Anderson parties, however, that Parks' counterclaim contains no allegations of tortious interference with contract by Signage Consultants or the Realty Company. Summary judgment was therefore proper as to those entities. *Bob v. Hardy*, 222 Ga. App. 550, 551 (1) (474 SE2d 658) (1996) ("a grant of summary judgment must be affirmed if it is right for any reason").

(g) Because some of Parks' tort counterclaims remain in the case, the assertion by the Anderson parties that they are entitled to summary judgment on Parks' claims for attorney fees and punitive damages is premature and without merit.

4. Count 2 of the complaint filed by Anderson and Multimedia alleges that Parks "falsely and maliciously accused Mr. Anderson of engaging in fraudulent activity and breaching contractual and fiduci-

ary obligations to [Parks]." The facts on which this claim is based are as follows. In the fall of 1992, Anderson contacted Tom McGuire, then president of the International Brotherhood of Electrical Workers Local Union 613, about placing a peach advertising sign on top of the IBEW building. McGuire testified that he later spoke with Parks, who said he was part owner of the company that originated the idea for the peach signs and that Anderson had capitalized on the idea and left Parks out of it. McGuire testified that Parks said Anderson "stole his idea." McGuire later clarified, however, that he could not remember any specific statements from the conversation and could not recall Parks using the word "stole." During his deposition, Parks testified that he told McGuire, as well as the IBEW's lawyer, "[s]omething to [the] effect" that Anderson "was acting illegally in regards to the corporation that he was an officer and a director in."

The complaint does not allege special damages, but instead alleges slander per se under OCGA § 51-5-4 (a) (1) and (3). Parks sought summary judgment on this claim. The trial court denied Parks' motion to the extent the claim was based on OCGA § 51-5-4 (a) (3), making charges calculated to injure another in his trade or profession. However, the trial court granted summary judgment to Parks to the extent the claim was based on OCGA § 51-5-4 (a) (1), imputing to another a crime punishable by law. Anderson and Multimedia contend that the trial court erred and that the jury should decide whether Parks' statements imputed a crime to Anderson. We disagree.

To constitute slander per se under OCGA § 51-5-4 (a) (1), the words at issue must charge the commission of a specific crime punishable by law. See *Hodges v. Tomberlin*, 170 Ga. App. 842, 843 (1) (319 SE2d 11) (1984). "[W]here the plain import of the words spoken impute no criminal offense, they cannot have their meaning enlarged by innuendo." *Burrow v. K-Mart Corp.*, 166 Ga. App. 284, 286 (1) (304 SE2d 460) (1983). Even though Parks may have used the term "illegal," his words did not accuse Anderson of committing any crime punishable by law. See *Bullock v. Jeon*, 226 Ga. App. 875, 877-878 (2) (487 SE2d 692) (1997) (term "m___-f___" did not amount to an accusation of incest). Rather, Parks' words are simply accusations of unethical, tortious behavior and, as such, are not defamatory. *Christian v. Ransom*, 52 Ga. App. 218, 221 (183 SE 89) (1935) (" 'If merely fraud, dishonesty, immorality, or vice be imputed, no action lies without proof of special damage.' "). The trial court did not err.

### Case No. A99A0626

5. Parks contends that the trial court erred in ruling that he lacks standing to pursue direct claims against Multimedia, Signage

294

Consultants, and the Realty Company. We agree in part.

Anderson argues, and the trial court ruled, that there is no authority for permitting a shareholder to bring a direct action against an entity that is not an officer, director, or shareholder of the corporation. It is undisputed that Multimedia, Signage Consultants, and the Realty Company never held any of those positions with respect to STI. However, we see no reason to limit only to corporate officers, directors, and shareholders the rule allowing a shareholder in a closely held corporation to sue directly when the rationale for derivative actions is not present.

The Anderson parties cite no Georgia case holding that direct actions brought by shareholders against third parties are improper. Instead, they rely on *Labovitz v. Washington Times Corp.*, 900 FSupp. 500, 504 (D. D.C. 1995), a decision from the federal district court in the District of Columbia which states that

> Delaware case law strongly suggests that when the corporation is injured by a third party, the corporation's directors are left to exercise their business judgment in deciding whether bringing suit is in the best interests of the corporation, and that the individual stockholders must rely on their directors to manage the firm.

(Citation omitted.) *Labovitz*, however, does not say categorically that shareholder direct actions against third parties are improper.[11] Numerous other jurisdictions have recognized that

> [a] shareholder may maintain an individual action against a third party for an injury that directly affects the shareholder, even if the corporation also has a cause of action arising from the same wrong, if the shareholder can show that the wrongdoer owed him a special duty or that the injury suffered by the shareholder is separate and distinct from the injury sustained by the other shareholders or the corporation itself.

*Barger v. McCoy Hillard & Parks*, 346 N. C. 650, 658-659 (488 SE2d 215) (1997); see also *In re Granite Partners, L.P.*, 194 BR 318, 325 (Bkrptcy. SDNY 1996); *Nowling v. Aero Svcs. Intl.*, 752 FSupp. 1304, 1314-1316 (E.D. La. 1990); *Flynn v. Merrick*, 881 F2d 446, 449 (7th Cir. 1989); *Nicholson v. Ash*, 800 P2d 1352, 1355 (Colo. App. 1990). This rule is in accord with Georgia cases, which have permitted

---

[11] In fact, *Labovitz* goes on to recognize the "special injury" exception discussed below. *Labovitz*, supra at 504-505.

shareholders to sue directly the officers and directors of the corporation where the shareholder suffered "a 'special injury,' i.e., an injury which is separate and distinct from that suffered by other shareholders." *Grace Bros., Ltd. v. Farley Indus.*, 264 Ga. 817, 819 (2) (450 SE2d 814) (1994).

We find no reason not to allow shareholder direct actions against third parties, particularly in a case such as this where the third parties are closely connected to an officer or director of the corporation. Multimedia, Signage Consultants, and the Realty Company are all controlled by Anderson and owned by him or his family. Parks alleges that Anderson used Multimedia, Signage Consultants, and the Realty Company to accomplish the ouster of Parks and conversion of STI's assets and that Parks was the only STI shareholder injured by these activities because the other shareholders had a financial interest in the three business entities. Under these circumstances, Parks has alleged a "special injury" and is entitled to maintain a direct action against the Anderson business entities. We therefore reverse the trial court's ruling on Parks' claims of conversion and tortious interference with contract.

We find, however, that Parks may not sue the Anderson business entities for misappropriation of STI's assets as a cause of action for misappropriation of a corporate business opportunity lies only against the officers or directors of the corporation. The obligation of officers and directors not to take for themselves opportunities that belong to the company "is but specie of the command that fiduciaries act with undivided loyalty, and is another manifestation of the requirement of utmost good faith." *Quinn*, supra at 218. Multimedia, Signage Consultants, and the Realty Company were not officers or directors of STI and owed STI no fiduciary duty. Thus, they cannot be sued for misappropriating the business opportunities of STI.

6. Parks enumerates as error the trial court's grant of a motion for protective order prohibiting Parks' counsel from using in the litigation two statements and a deposition given by witness Denise Winsett. In January 1995, counsel for Parks noticed the deposition of Winsett, a former employee of Jalex and JMB.[12] At that time, neither Jalex nor JMB was a party to the litigation. Upon receiving the notice, Winsett called Parks' attorney and told him that she could not appear on the noticed date. She also asked for his help on an unrelated legal matter, which he agreed to discuss with her. Winsett went to the attorney's office the following week.

The events of that meeting are sharply disputed, as evidenced by

---

[12] When he served the notice, counsel for Parks did not know that Winsett no longer worked for Jalex and JMB, but she informed him of this fact during their first communication.

the competing affidavits of Winsett and Parks' attorney. Winsett claims that she agreed to meet the attorney only because he promised to assist her with an unrelated legal matter; that the bulk of the meeting was spent discussing the other matter; and that the attorney retained her papers and agreed to look into the matter. After that discussion, the attorney questioned Winsett about the dealings between Parks and her former employer. Although the attorney tape-recorded the interview, Winsett claims that he assured her that the taping was only for his convenience, that their conversation was "off the record," and that her answers would never be used in any legal proceeding. According to Winsett, she agreed to speak only because "I thought I was talking to my own lawyer."

The attorney, on the other hand, claims he told Winsett that a transcript of the interview would be used to prepare a witness statement for her signature, and he denies telling her the statement would not be used against her. While he admits that he discussed an unrelated legal matter with Winsett at the meeting, he denies misleading her about the purpose of the meeting or coercing her into coming. Another attorney for Parks submitted an affidavit stating that he had a follow-up conversation with Winsett in the summer of 1995, during which she spoke freely and voluntarily and agreed to sign a statement. No statement was ever prepared, however.

Winsett resumed employment with Jalex and JMB in August 1995. Jalex and JMB were brought into the litigation as counterclaim defendants in December 1995. Co-counsel for Parks deposed Winsett in 1996 and sought to use a transcript of the February 1995 interview to impeach her or refresh her recollection. Attorneys for the Anderson parties objected to the use of the transcript and later moved to disqualify Parks' lawyers, arguing that they acted improperly in interviewing Winsett and using her statement. Attorneys for the Anderson parties also sought to prohibit the use of any discovery obtained from Winsett.

The trial court denied the motion to disqualify, finding that Parks' counsel complied with the letter of rules governing the conduct of Georgia lawyers. However, the court found that the attorneys' method of obtaining the discovery in question was "highly questionable" and therefore granted the protective order. Parks complains that the trial court failed to recite any specific factual basis for its finding of bad faith.

A trial court has discretion to enter protective orders controlling pre-trial discovery if "the court is satisfied by substantial evidence that bad faith or harassment motivates the discoverer's action." (Punctuation and emphasis omitted.) *Osborne v. Bank of Delight*, 173 Ga. App. 322, 324 (2) (326 SE2d 523) (1985); see also *Deloitte Haskins & Sells v. Green*, 187 Ga. App. 376, 379 (2) (370 SE2d 194)

(1988). Here, the trial court was faced with competing affidavits describing the circumstances of Winsett's February 1995 interview by Parks' attorney.[13] The trial court could have credited Winsett's account over counsel's, concluding that the attorney misrepresented his intentions with respect to the purpose of the interview and misused his new attorney-client relationship with Winsett to encourage her to speak freely about matters on which she might otherwise have chosen to remain silent. While counsel's actions may not have contravened any specific rules of professional conduct, the evidence before the trial court nevertheless could have permitted a finding of bad faith justifying imposition of the protective order. We find no abuse of discretion.

*Judgment affirmed in part and reversed in part. McMurray, P. J., and Andrews, P. J., concur.*

DECIDED JULY 8, 1999 —
RECONSIDERATION DENIED JULY 23, 1999 

*Swift, Currie, McGhee & Hiers, W. Ray Persons, Robert E. Jones, Adam R. Gaslowitz*, for appellant.
*Schreeder, Wheeler & Flint, David H. Flint, Mark W. Forsling, William W. Gardner*, for appellees.

---

[13] According to the trial court's order, the court also reviewed in camera the transcript of Winsett's interview. Because Parks has not placed that transcript into the record, we must assume that it supports the trial court's ruling. *Griffin v. Travelers Ins. Co.*, 230 Ga. App. 665, 666 (497 SE2d 257) (1998).