A00A0137. HABERSHAM VENTURE, LTD. v. BREEDLOVE et al.
A00A0138. P. E. ATLANTA, INC. v. BREEDLOVE et al.
(535 SE2d 788)

ANDREWS, Presiding Judge.

Pursuant to our grant of their applications for interlocutory review, we consider whether, as owner of the leasehold and operator of a nightclub, respectively, Habersham Venture, Ltd. (Habersham) and P. E. Atlanta, Inc. d/b/a Bell Bottoms Nightclub (Bell Bottoms) were entitled to summary judgment on Larry Breedlove, Jr.'s and Marshall Bolinger, Jr.'s premises liability claims for injuries resulting from a fight in the parking lot of Bell Bottoms.

> The standards applicable to motions for summary judgment are announced in *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991). When ruling on a motion for summary judgment, the opposing party should be given the benefit of all reasonable doubt, and the court should construe the evidence and all inferences and conclusions therefrom most

---

favorably toward the party opposing the motion. *Moore v. Goldome Credit Corp.*, 187 Ga. App. 594, 596 (370 SE2d 843) (1988). Further, this court conducts a de novo review of the law and the evidence. *Desai v. Silver Dollar City*, 229 Ga. App. 160, 163 (1) (493 SE2d 540) (1997).

*Clark v. Cauthen*, 239 Ga. App. 226, 227 (1) (520 SE2d 477) (1999).

So viewed, the evidence was that on Friday, August 19, 1995, Breedlove, Bolinger, Ricky Brewer, and two women acquaintances met at Breedlove's home before going to Buckhead for the evening to celebrate Brewer's birthday. They arrived at Breedlove's around 8:00 p.m., consumed some beer, and went to Bell Bottoms around 9:30 p.m. Bolinger had been to Bell Bottoms previously, although the others had not.

Bell Bottoms, which had opened in January 1995, was located in a shopping center off Pharr Road. Also located in the shopping center were a Lettuce Souprise You restaurant, Atlanta Blue Print Company, and another retail space then unused. Each of the businesses occupied a separate building, and the parking lot was used jointly by the businesses. Pursuant to the lease, Habersham was obligated to maintain the parking lot for the tenants.

Breedlove, Bolinger, Brewer, and the two women pulled into the parking lot and parked their two cars between Atlanta Blue Print and Bell Bottoms. There were no security personnel in the parking lot, nor were there any signs regarding security. The parking lot was lighted, but neither Breedlove nor Bolinger recalled a light near where they chose to park.

The group went into Bell Bottoms and stayed about two and one-half hours. During this time, Breedlove and Bolinger consumed three to four more beers each. There was no difficulty encountered by the party while in Bell Bottoms. Upon leaving, the five walked around Bell Bottoms to Bolinger's car. As they walked to the car, they noticed three men standing in the parking lot near Lettuce Souprise You and heard a derogatory comment addressed to one of the women. No one in the group knew any of these three men, and they had not seen them in Bell Bottoms. Breedlove responded "[h]ey, a——holes; . . . hey, jerk; leave us alone. We don't want any trouble. We want to get out of here. We're trying to get in our car and leave. . . . [D]on't screw with us."

The group proceeded to Bolinger's car where they stood talking and smoking for three or four minutes. Brewer and one of the women were standing on one side of the car, and Breedlove and Bolinger were standing on the other side looking toward Brewer, with the other woman sitting in the car. Comments from the other group continued, and Bolinger was then stabbed in the back of his head. He did

not see his assailant approach. Breedlove, hearing Brewer shout about Bolinger, looked up and saw the two assailants, later identified as Hearing and Spivey, and realized that Bolinger was injured. Breedlove retrieved an aluminum softball bat from the trunk of his car and proceeded to strike Hearing in the shoulder and back. As Breedlove attempted to strike Hearing again, he was stabbed in the back twice by Spivey. Hearing then got the bat and struck Breedlove repeatedly, while Brewer jumped on Spivey's back.

The location of the assaults was not visible from the door of Bell Bottoms, and at no point during the altercation did anyone attempt to go into Bell Bottoms to summon help. Finally, an off-duty Drug Enforcement Administration agent who was a customer at Bell Bottoms came out, the assailants ran, and police and paramedics were summoned.

Asked the basis for their contention that Habersham and Bell Bottoms were legally responsible for their injuries, Bolinger said "I think there should have been more sufficient lighting in the parking lot as well as security guards," and Breedlove said "[l]ack of security provided for their [Bell Bottoms'] parking." Both men acknowledged that, prior to this incident, they were unaware of any previous acts of violence occurring in the parking lot and that they did not consider the Buckhead area dangerous.

Caswell, in charge of leasing for Habersham at the time of the lease to P. E. Atlanta, Inc. and the time of the incident, was unaware of any criminal attacks on patrons in bars in the Buckhead area. Habersham had not provided any private security for the parking lot and had not been advised of any problems with the lighting of the lot.

Orr, Vice President of P. E. Atlanta, Inc. and in charge of running Bell Bottoms, had door staff who worked the door of the club to check for identification. These staff members were told, if a fight occurred in the club, to attempt to break it up. There had previously been only pushing and shoving incidents inside the club, and although he was unaware of any previous fights in the parking lot, had there been one, he would have called police. Orr did hire off-duty Atlanta police officers for weekend security inside Bell Bottoms, but the officer's duty was pretty much to stay inside the door of the club and observe, as a deterrent. The officer was not at the club on the evening of the assault.

## Case No. A00A0137

1. We consider first the issue of Habersham's duty to the injured patrons and its contention that it was entitled to summary judgment.

A landlord's duty to its tenants arises under OCGA § 51-3-1. In Georgia that duty extends to protecting tenants from third-party

criminal acts under certain circumstances. *Doe v. Prudential-Bache &c. Realty Partners, L.P.*, 268 Ga. 604 (492 SE2d 865) (1997); *Sturbridge Partners v. Walker*, 267 Ga. 785, 786 (482 SE2d 339) (1997). While the general rule is that a landlord is not an insurer of his tenant's safety, the landlord does have a duty to exercise ordinary care to prevent foreseeable third-party criminal attacks upon tenants. The duty to guard against crime generally arises when, due to prior experience with substantially similar types of crime, the landlord has reason to anticipate criminal acts. A tenant will be precluded from recovery, even where such prior acts are known to the landlord, however, as a matter of law, when he or she has equal or superior knowledge of the risk and fails to exercise ordinary care for his or her own safety. *Johnson v. Atlanta Housing Auth.*, 243 Ga. App. 157 (532 SE2d 701) (2000); *Jackson v. Post Properties*, 236 Ga. App. 701-702 (513 SE2d 259) (1999).

Here, prior to the incident at issue, Caswell, representing Habersham, was unaware of any reports of either property crimes or crimes against persons. Caswell's statement that it "was possible" his father might have attended a meeting of the Buckhead Coalition during which police reports were discussed is of no worth to Breedlove and Bolinger in proving a factual issue regarding knowledge of police reports. First, it is based on hearsay which is probative of nothing. *Estate of Patterson v. Fulton-DeKalb Hosp. Auth.*, 233 Ga. App. 706, 707 (1) (505 SE2d 232) (1998); *Whitmore v. First Fed. Sav. &c.*, 225 Ga. App. 768, 769 (1) (484 SE2d 708) (1997). Second, it is the law in Georgia that a property owner is under no obligation to investigate police files to determine whether criminal activities have occurred on his property. *Sun Trust Banks v. Killebrew*, 266 Ga. 109 (464 SE2d 207) (1995); *Johnson*, supra.

Both plaintiffs acknowledged that they were familiar with the area, had no knowledge of prior criminal incidents in the area, and did not consider Buckhead dangerous.

Plaintiffs' argument to extend the rationale applied to automatic teller machines in *Whitmore*, supra, to bars and shopping center parking lots as a means of demonstrating a jury issue regarding foreseeability has previously been rejected. *Carlock v. Kmart Corp.*, 227 Ga. App. 356, 358 (1) (489 SE2d 99) (1997); *W. D. Enterprises v. Barton*, 218 Ga. App. 857, 859 (463 SE2d 529) (1995).

The plaintiffs were unable to show superior knowledge on behalf of Habersham of the danger, and Habersham was entitled to summary judgment. Compare *Doe*, supra at 606, and *Sturbridge*, supra, with *Woodall v. Rivermont Apts., L.P.*, 239 Ga. App. 36, 39-41 (1) (520 SE2d 741) (1999).

2. Habersham's third enumeration deals with the trial court's failure to rule on its motion to strike two expert affidavits submitted

by plaintiffs in an effort to show a jury issue regarding foreseeability. We need not address this enumeration, however, because the affidavits do not comply with OCGA § 9-11-56 (e) in that they do not attach or specify the "evidence currently of record" upon which the experts' opinions were premised. Further, the affidavits went only to the *Whitmore* argument, rejected in Division 1, supra.

3. The remaining argument, dealing with mutual combat, raised by Habersham is also raised by Bell Bottoms and is considered below.

### Case No. A00A0138

4. Bell Bottoms' first two enumerations are that it was entitled to summary judgment because the acts were not foreseeable and, additionally, Breedlove engaged in mutual combat. They are considered together.

Just as the assaults were not foreseeable to Habersham, the entity which had control over the parking lot, neither were they foreseeable to Bell Bottoms, whose premises, pursuant to the lease, consisted only of the building. *Doe*, supra; *Johnson*, supra; *Carlock*, supra; *W. D. Enterprises*, supra.

Also, since Breedlove voluntarily chose to enter into mutual combat with the assailants, "the superior knowledge must always remain with the combatants, as they, by their voluntary participation, have selected the time, date, and place for the altercation." *Sailors v. Esmail Intl.*, 217 Ga. App. 811, 813 (1) (459 SE2d 465) (1995). *Rappenecker v. L.S.E., Inc.*, 236 Ga. App. 86, 87 (1) (510 SE2d 871) (1999). Bell Bottoms was also entitled to summary judgment.

5. Bell Bottoms' third enumeration is controlled by Division 2, supra, and the fourth enumeration is rendered moot by our decision in Division 4, supra.

*Judgments reversed. Ruffin and Ellington, JJ., concur.*

DECIDED JUNE 12, 2000.

*Swift, Currie, McGhee & Hiers, Bradley S. Wolff, Law Office of Stacey A. Torpey, Leslie A. Lunsford*, for appellants (case no. A00A0137).

*Eric T. Johnson*, for appellants (case no. A00A0138).

*C. Suzette Ellis-Hoyle*, for appellees.