A06A0108. MASON v. CHATEAU COMMUNITIES, INC. et al.
(633 SE2d 426)

BARNES, Judge.

Helen Marie Mason rented land in Smokecreek Community from Chateau Communities, Inc., upon which she lived in a mobile home that she owned. She sued Chateau for premises liability damages resulting from a rape, asserting that the landlord breached its duty of care to keep the premises safe from reasonably foreseeable unlawful acts. She also sued her attacker, Terry Lee Goolsby, for battery and punitive damages. Chateau answered, denying liability, and moved for summary judgment following discovery. The trial court granted summary judgment to both Chateau and Goolsby, and Mason appeals. For the reasons that follow, we reverse.

1. Mason argues that the trial court erred in granting summary judgment to Goolsby, who had no motion pending before the court. Chateau agrees that the trial court erred in that regard. Although the trial court subsequently amended its summary judgment order to delete reference to Goolsby, the court was without jurisdiction to do so at the time because Mason's appeal was pending in this court. *Dalton American Truck Stop v. ADBE Distrib. Co.*, 146 Ga. App. 8, 11 (4) (245 SE2d 346) (1978). Thus we reverse that portion of the original order granting summary judgment to Goolsby.

2. After reviewing the record and the law, the trial court held that

> there are no disputes as to genuine issues of material fact on the issue of Defendants' duty to provide security to Plaintiff. As the evidence is undisputed that Defendants were not required to provide security for the tenants of Chateau Communities, Inc., and therefore, no act of Defendants caused or contributed to any damage to Plaintiff, summary judgment in favor of Defendant Chateau Communities, Inc. . . . is therefore granted.

The standards applicable to motions for summary judgment are announced in *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991). When ruling on a motion for summary judgment, a court must give the opposing party the benefit of all reasonable doubt, and the evidence and all inferences and conclusions therefrom must be

construed most favorably toward the party opposing the motion. *Moore v. Goldome Credit Corp.*, 187 Ga. App. 594, 595-596 (370 SE2d 843) (1988). The trial court cannot, however, resolve the facts or reconcile the issues. *Fletcher v. Amax, Inc.*, 160 Ga. App. 692, 695 (288 SE2d 49) (1981). When reviewing the grant or denial of a motion for summary judgment, this court conducts a de novo review of the law and the evidence. *Desai v. Silver Dollar City*, 229 Ga. App. 160, 163 (1) (493 SE2d 540) (1997).

Viewed in this light, the evidence shows that Chateau Communities, Inc. is the property manager for the Smokecreek Community, which is owned by CWS, Inc. Approximately 264 mobile homes are located in Smokecreek, and the residents own the homes and rent the lots. Homeowners are not allowed to rent out their homes, and guests may stay only 15 days consecutively and 30 days total in a year; if they stay longer, they must apply for permission and receive approval to become a resident. Long-term guests must be registered with the office, and the "management reserves the right to terminate the Tenancy At Will of any Resident whose guest(s) do not comply with these covenants." Management also reserves the right to terminate the tenancy of a resident for any violations of the covenants or misstatements in the residency application. Before anyone is allowed to buy a mobile home in Smokecreek, they must sign permission for credit and criminal background checks, prove they have made timely rental or mortgage payments for the previous 24 consecutive months, prove they have a minimum of two years' employment history in the same field earning at least a minimum established amount, and all residents must obtain the Chateau community director's approval before buying their home. Residents agree to abide by particular rules and by the community covenants.

The community covenants control numerous aspects of the residents' lives, by, for example, forbidding residents to erect fences except those approved "in writing by the Community Director"; own dogs over a certain size or of certain breeds; install a doghouse outside; hang laundry or store tools, toys, or lawn care equipment so that they are visible outside; perform anything but minor repairs on motor vehicles; or acquire swing sets, trampolines, pools, or basketball goals. The speed limit inside the community is 15 mph and street parking is not allowed. The covenants further provide that

> [a]ll dangerous instruments, including but not limited to, guns, BB guns, paint guns, air guns, as well as sling shots, bows and arrows, and other dangerous instruments are not permitted in the Community. Throwing dangerous instruments including, but not limited to rocks, knives, eggs, sticks, and any other items is strictly forbidden.

Community management reserved the right of entry to the resident's home "for purposes of[,] including, but not limited to, . . . protection of the Community, inspection of the home site and buildings, and, at all reasonable times, for maintenance of the home site." Management also reserved the right of access "only to prevent imminent danger to the occupant or the manufactured home."

A former senior regional manager for Chateau confirmed that the community covenants state that "[a]ll reasonable means have been taken to insure that your residency is pleasant and enjoyable." If a neighbor told a manager or the manager himself, who lived on the premises, saw that someone was living in the community who was not approved, management would ask them to fill out an application. A letter from the company president included in the employees' safety manual states that "Chateau Communities, Inc. is committed to the safety of its employees, residents, and guests." The manual states that "[s]afety is one of the highest priorities at Chateau Communities," and company policy provides that the community manager must complete an incident report and send it to risk management each time an incident or accident occurs. Some communities have security guards, and the decision to have one was made by the regional manager and division president based on their review of current and previous criminal activity on the property. Security guard pay comes from the community budget, and the company rewarded managers for keeping their operating expenses below budget.

Mason bought her mobile home from Chateau in August 2002, and rented the lot on which the mobile home was located. She lived there with her two children, who were eleven and twelve at the time. The manager told her it was the safest place to live, that mostly single women, children, and elderly people lived there, and that this was a safe environment for children. She asked about security, and the manager responded that the community was secure. Mason was concerned about safety because trailer parks are "usually considered not the best place," but the manager told her there were no problems. Her street had one streetlight, and the area was "pretty dark," although another light was added after her attack. She thought that more lighting might have made the community safer.

The evidence shows that Mason's rape was preceded by an assault and another rape in the community by the same man. The first victim, S. P., reported to the community manager in early September 2002 that she woke up one night to find a man standing in her bedroom. He grabbed her breast and then left. While the manager reported the event to his company's risk management division, he thought S. P. had been dreaming. After this incident, Mason called the manager and said she had heard from neighborhood children that S. P. had been hurt, but the manager assured her that S. P. was elderly

and did not know what she was talking about, and that he did not believe anything had happened to her. Mason said Chateau needed to provide more security, and the manager responded that S. P. was "just seeing things or something." She told him Chateau should install more lighting because it was very dark in that area.

Rosa Estrada, who lived across the street from Mason and next door to Goolsby, testified that she moved to the community in 1998. Before Chateau took over the property management, the neighborhood was "one of the nicest places," with good screening, security, and frequent police patrols at night. A policeman who was a friend of her son-in-law had been patrolling the area part-time, but after Chateau took over, the patrols stopped. When Estrada asked the new manager about it, he said that the community could not afford to pay for the patrols but that the county police would drive through the neighborhood on patrol. The new owners built new lots that brought in "all kinds of new people," and the lot rental increased. Teenagers began gathering nearby, and she asked management to install more lighting because it was so dark and the existing lights were continually broken. Management said they would look into the lighting issue. When she heard about the first assault on S. P., she asked the manager about it, but he said that S. P. was hallucinating, and at 80 was "just a senile person that is imagining things happening."

Two or three weeks after this first incident, a resident called the manager to tell him that many police were at S. P.'s trailer. The manager went down there, and an officer told him that S. P. had been assaulted. He discovered later that day that she had been raped, and he gave another resident permission to post bulletins about it. The manager then reported the incident to the company.

Estrada called the manager and asked him what he knew about the new couple living next door, and he said it was not a couple, only a single mother and her child living next door. Estrada insisted that a man lived there too, and she wanted to know if the manager had "run a report" on him before he moved in. Estrada explained that she had not only seen the man living there, at home all day long, but also the woman who previously lived there told her she sold her trailer to a young couple who were expecting a baby. The manager said he would call the resident and check it out. When Estrada asked him again about the man, the manager said he had left a message for the resident but had not heard back and would go personally and tell her to report whoever else was living there. Estrada thought the man was suspicious because he never went to work, drank all day, and when he first moved in, he was extremely rude to her husband so she wanted to know if the manager had checked him out before he moved in. She did not call the police herself and report her suspicions that the man, Goolsby, could be S. P.'s rapist, because she thought that she did not

have enough information for them to take her seriously, so she wanted the manager to call the police and tell them about whatever background his pre-resident report showed. The manager never returned her phone calls, and Estrada felt strongly that he did not care, and that even if she complained about something, he was not going to do anything about it.

Wayne Thomas, a Smokecreek resident since October 2002, is a retired Fulton County sheriff's deputy. He said that when he moved in, signs at the community entrance, clubhouse, and houses for sale advertised that Smokecreek was a "safe retirement community." Before Thomas moved in, he asked the manager if he could provide security for the community in exchange for the lot rental fee, but the manager said he already had a security officer on the property day and night. The manager also said that Smokecreek was a retirement community. After S. P. was raped, Thomas reminded the manager that he said the community had security, and the manager said it did, as well as increased county police patrols in the area. The manager told residents at a subsequent neighborhood watch meeting that he had provided security and would provide more security in the form of more frequent county police patrols; however, many residents walked out of the meeting because they knew the property had no security.

On December 21, 2002 around 4:00 or 5:00 a.m., Mason heard a noise in her mobile home and got up to see where it came from. She went to the front door, then turned and saw Goolsby silhouetted behind her. She fought with him, but he dragged her into the bedroom, tied her hands, and raped her. He told her he had watched her for a long time. Afterward she managed to escape from him, and grabbed her car keys as she ran out the door. She drove to a nearby service station, where an employee called 911. The police transported Mason to a rape crisis center. She thought Goolsby entered through the front door, because when she returned to her trailer, she saw that it was damaged as if someone tried to pry it open, although the investigating detective thought Goolsby came in the back door which he said she must had not have locked correctly. She replaced the front door because it was "bent up and chewed up," and outside the door the wooden part was broken out.

Estrada gave Goolsby's name to the police when they canvassed the neighbors following Mason's attack. The police subsequently arrested him at the trailer across the street from Mason, where the neighbor previously reported to management that he had been living. The manager testified that he now knew Goolsby had been living there, as Estrada said he was, although he said the resident of the trailer where Goolsby was living told him when he asked earlier that Goolsby was just visiting his child from time to time. Mason identified

Goolsby in a lineup, and his DNA matched DNA found as a result of Mason's examination. In July 2004, Goolsby was convicted of raping both S. P. and Mason.

Mason's expert witness, a crime prevention analyst, testified that Chateau Communities managed the property in a manner that demonstrated a consistent pattern of inadequate crime prevention planning and inadequate security and safety management, in direct contradiction to their stated objectives. The company represented in its resident application forms that it controlled who lived in the community and that it performed criminal background checks of prospective residents. The operations manual directed Chateau employees to explain to residents that the company "works toward providing a safe living environment, . . . that we have an excellent relationship with local law enforcement officials." The company exerts an extraordinary level of control over residents, including limiting certain personal safety measures such as fencing, dog size and breed, guns, and doghouses, but does not adequately compensate for these strictures by providing alternative security. The company did not avail itself of the free crime prevention survey service of the Gwinnett County Police Department, which includes a site survey and recommendations. Despite a consistently increasing crime rate of 150 percent in 2001-2002, management failed to establish a procedure to request information from local law enforcement about crime in the area. In contrast, crime in the Atlanta metropolitan area decreased 3.9 percent, and in the state of Georgia, 3 percent.

The expert witness testified that, while the manager acknowledged the importance of informing residents of criminal activity, he had no procedure in place to do so, and even if residents learned of crimes in their community from other sources, those sources may be replete with rumor and innuendo. Chateau failed to establish a procedure to adequately identify nonauthorized residents of the community and enforce the relevant guidelines. Their employees received little training about crime prevention and security, and Chateau failed to gather and assess information regarding the area's criminal activity. Finally, Chateau should have developed a plan of action to address assessed needs for crime prevention and security.

When asked what Chateau could have done to prevent Mason's attack, the expert noted that security surveys of 75 to 100 multiple-unit dwellings showed that the best deterrent to crime is fear of detection. Security patrols increased the likelihood of discovery during a crime. The company could have told residents of the increase in crime and been proactive in advocating caution or even hypervigilance; it could have aggressively addressed the issue of guests on the property, determined who they were, and limited their presence; and it could have considered instituting an after-hours security presence.

Here, Goolsby, an unregistered guest of whom the landlord had notice, had time to observe residents' patterns and select his victim, someone who lived close to where he was staying, which reduced his chance of detection.

Mason contends that Chateau, as her landlord, breached its duty of care to keep its premises safe from reasonably foreseeable unlawful acts. Chateau responds that it breached no duty to Mason because it had fully parted with possession and control of her home and had never undertaken or promised to provide security for the community. OCGA § 51-3-1 imposes a nondelegable duty upon a landowner to keep his premises in a reasonably safe condition, and a landowner must use ordinary care to do so. *Hickman v. Allen*, 217 Ga. App. 701, 702 (458 SE2d 883) (1995).

> The general rule regarding premises liability is that a landlord does not insure tenants' safety against third-party criminal attacks, and that any liability from such attacks must be predicated on a breach of duty to "exercise ordinary care in keeping the premises and approaches safe." OCGA § 51-3-1. A landlord's duty to exercise ordinary care to protect tenants against third-party criminal attacks extends *only* to *foreseeable* criminal acts. See *Days Inns of America v. Matt*, 265 Ga. 235, 236 (454 SE2d 507) (1995). The difficulty arises in determining which criminal acts are foreseeable.

(Emphasis in original.) *Sturbridge Partners, Ltd. v. Walker*, 267 Ga. 785, 785-786 (482 SE2d 339) (1997). Further,

> [a] proprietor's duty to invitees is to "exercise ordinary care in keeping the premises and approaches safe." OCGA § 51-3-1. The proprietor is not the insurer of the invitee's safety, *Pound v. Augusta Nat.*, 158 Ga. App. 166 (279 SE2d 342) (1981), but is bound to exercise ordinary care to protect the invitee from unreasonable risks of which he or she has superior knowledge. *Atlanta Gas Light Co. v. Gresham*, 260 Ga. 391 (394 SE2d 345) (1990). If the proprietor has reason to anticipate a criminal act, he or she then has a "duty to exercise ordinary care to guard against injury from dangerous characters." *Atlantic C. L. R. Co. v. Godard*, 211 Ga. 373, 377 (86 SE2d 311) (1955).

*Lau's Corp. v. Haskins*, supra, 261 Ga. at 492. Thus the incident causing injury to the plaintiff "must be substantially similar in type to the previous criminal activities occurring on or near the premises so that a reasonable person would take ordinary precautions to

protect his or her customers or tenants against the risk posed by that type of activity. . . . *Sturbridge Partners*, supra at 786." (Punctuation and emphasis omitted.) *Walker v. St. Paul Apts.*, 227 Ga. App. 298, 300 (489 SE2d 317) (1997). "Knowledge of a dangerous condition giving rise to the incident is necessary in order to show the existence of even an initial duty to provide preventive security measures for this type of attack. *Bishop v. Mangal Bhai Enterprises, Inc.*, 194 Ga. App. 874, 877 (392 SE2d 535) (1990)." *Ritz Carlton Hotel Co. v. Revel*, 216 Ga. App. 300, 303 (2) (454 SE2d 183) (1995).

In this case, Mason has established that a question of fact exists as to whether the landlord should have reasonably foreseen the criminal attack upon her, based on the evidence presented regarding a stranger's intrusion into another tenant's apartment at night and that tenant's subsequent rape by Goolsby, the same man who raped Mason. These incidents are substantially, if not completely, similar to each other, and Chateau was put on notice that the possibility of such an attack could occur.

Once a plaintiff shows that a question of fact exists on whether the landlord should have reasonably foreseen a criminal attack upon its tenant, the next issue is whether the evidence establishes a question of fact on whether the landlord exercised ordinary care to protect its tenants. *Lau's Corp. v. Haskins*, supra, 261 Ga. at 492.

> "Exactly what constitutes 'ordinary care' varies with the circumstances and the magnitude of the danger to be guarded against. Since it is impossible to prescribe definite rules in advance for every combination of circumstances which may arise, the details of the standard must be filled in each particular case. But, to be negligent, the conduct must be unreasonable in light of the recognizable risk of harm." (Citations and punctuation omitted.) *Lau's Corp.*, supra at 493.

*Matt v. Days Inns of America*, 212 Ga. App. 792, 794 (443 SE2d 290) (1994), aff'd, *Days Inns of America v. Matt*, supra (summary judgment for innkeeper reversed because genuine issues present on whether security measures adequate or performed negligently).

In this case, a question of fact exists on whether Chateau exercised ordinary care in response to a reasonably foreseeable criminal attack. When S. P. told Chateau that a strange man entered her house and assaulted her, the manager said she was a senile old woman who was imagining things. After S. P. was raped, a neighbor suspected Goolsby. Despite the neighbor's request that management investigate Goolsby because she suspected him and wanted the manager to give Goolsby's background information to the police,

Chateau did nothing. It did not investigate Goolsby to determine whether he was a resident and did not enforce its own policies of allowing guests to stay no longer than 15 consecutive days or 30 days in a year. Further, several tenants testified that the lighting was bad around Mason's lot and that they had complained about it to management, but to no avail. Finally, the record contains no evidence that Mason failed to exercise ordinary care for her safety. See *Habersham Venture v. Breedlove*, 244 Ga. App. 407, 410 (1) (535 SE2d 788) (2000).

Given these facts, a jury question exists as to whether Chateau should reasonably have foreseen a criminal attack against the plaintiff in her mobile home, and whether Chateau exercised ordinary care to protect its tenants.

*Judgment reversed. Johnson, P. J., Blackburn, P. J., Miller, Ellington and Bernes, JJ., concur. Andrews, P. J., concurs in part and dissents in part.*

ANDREWS, Presiding Judge, concurring in part and dissenting in part.

I concur to the extent the majority reverses the grant of summary judgment in favor of Terry Lee Goolsby, who was identified by Helen Marie Mason as the man who raped her. I respectfully dissent to the majority's reversal of the grant of summary judgment in favor of Chateau Communities, Inc. (Chateau). Mason was raped inside the mobile home she owned, controlled and occupied as her residence after the rapist broke into the mobile home through a locked door. Mason's complaint alleges that Chateau is liable to her for the rape inside her mobile home because Chateau breached a duty owed to her to keep its premises safe from reasonably foreseeable criminal attacks. On appeal from the grant of summary judgment to Chateau, Mason states that the controlling issue is the "duty on the part of [Chateau] owed to [her] as an invitee" and argues that Chateau breached a duty owed to her under OCGA § 51-3-1 to keep its premises safe. Even though Mason's mobile home was located within the premises of a Chateau-managed mobile home community, the trial court correctly granted summary judgment in favor of Chateau on the basis that Chateau had no duty under OCGA § 51-3-1 to prevent the unlawful entry into and rape inside of the mobile home premises owned and controlled by Mason.

> To prevail on a motion for summary judgment [under OCGA § 9-11-56 (c)], the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law. The moving party may carry this burden either by (1) presenting

evidence negating an essential element of the nonmoving party's claim, i.e., affirmatively disproving the element with evidence which makes it impossible for the nonmoving party to prove the element at trial; or (2) demonstrating an absence of evidence to support an essential element of the nonmoving party's claim. If the moving party discharges this burden, the nonmoving party cannot rest on its pleadings, but rather must point to specific evidence giving rise to a triable issue. On appeal, we review de novo the trial court's ruling on a motion for summary judgment, construing all facts and reasonable inferences therefrom in the light most favorable to the nonmovant.

(Citations and punctuation omitted.) *Parks v. Multimedia Technologies*, 239 Ga. App. 282, 286-287 (520 SE2d 517) (1999); *Lau's Corp. v. Haskins*, 261 Ga. 491, 495 (405 SE2d 474) (1991). Applying these principles, the record supports the trial court's grant of summary judgment in favor of Chateau.

Mason owned the mobile home which she used as her residence, and she rented the lot on which it was located in the Smokecreek Manufactured Home Community (Smokecreek). When Mason rented the lot, Smokecreek was owned by CWS, LLP and managed by Chateau as a mobile home community of about 264 resident-owned mobile homes located on lots rented to the residents by Chateau as the agent of CWS. In her complaint against Chateau, Mason alleged that a man she later identified as Goolsby broke into her mobile home while she was asleep at about 4:00 a.m. and assaulted and raped her. Mason testified by deposition that the doors and windows on her mobile home were closed and locked on the night of the attack. She said that police thought the rapist gained entry through the back door, but she believed that he broke in through the front door because the front door was damaged. Mason got a good look at the man's face during the attack but said she had never seen him before. Mason later identified Goolsby as the rapist from a police lineup and learned for the first time that Goolsby lived in a mobile home across the street from her at Smokecreek. In her complaint, Mason alleged that Chateau operated and controlled the premises at Smokecreek and had a duty to keep the premises safe. She alleged that prior criminal acts on the premises made the assault and rape against her foreseeable, and that Chateau "breached its duty to keep their premises safe from reasonably foreseeable, unlawful acts of third parties on their premises" by failing "to correct the circumstances or to take appropriate measures to reduce exposure to reasonably foreseeable crimes and acts of violence."

Under restrictive covenants applying to Smokecreek, all residents renting lots for mobile homes were required to own the mobile homes. Chateau's lot rental agreement with Mason shows that Mason paid $353 per month for possession of the lot along with water, sewer and garbage service provided by Chateau, and that Chateau, as lessor of the lot, reserved a right of access for inspection, maintenance, and emergencies. The lot rental agreement provided that residents were responsible for keeping the lot clean including mowing and all yard work. The rental agreement made clear that residents were responsible for making all necessary repairs to the rented lot and to the resident-owned mobile home located on the lot, and that Chateau was responsible for maintaining "common areas and underground utilities." Neither the rental agreement nor the covenants contained any provision for Chateau to provide security services related to the lot or the mobile home. Mason testified that there was no provision for or assurances of security in the Smokecreek lease or covenants and that, when she moved into Smokecreek, the Chateau manager "didn't mention any kind of security measures." Mason said she remembered that it seemed to be a safe place for children because there were a lot of them walking around, and that the Chateau manager said it was "very safe," that they had "no problems," and that it was so safe people left their windows and doors open. Nevertheless, Mason was aware prior to her own rape that another resident had been attacked on one occasion and raped on another occasion at Smokecreek. She was also aware that security at her mobile home was her responsibility. Mason had an electronic security system in her mobile home, but it was broken and she did not get it repaired before the rape. She purchased motion detector lights for her mobile home prior to the rape, but she never got around to having them installed. She was aware that Smokecreek residents had formed a neighborhood watch group to provide for their own security, but she did not join the group because she did not have time because of her work. Mason complained to the Chateau manager that she thought they needed to provide more security, and the manager suggested that she join the neighborhood watch group.

In moving for summary judgment, Chateau asserted that it was not liable for the rape pursuant to the duty imposed on it under OCGA § 51-3-1 to keep its premises safe because the rape occurred inside Mason's mobile home, a premises owned and controlled by Mason. Under OCGA § 51-3-1,

[w]here an owner or occupier of land, by express or implied invitation, induces or leads others to come upon his premises for any lawful purpose, he is liable in damages to such

persons for injuries caused by his failure to exercise ordinary care in keeping the premises and approaches safe.

A premises liability claim under OCGA § 51-3-1 sounds in negligence. *Johnson v. Allen*, 272 Ga. App. 861, 868 (613 SE2d 657) (2005); *Doe v. Prudential-Bache/A.G. Spanos Realty Partners*, 268 Ga. 604 (492 SE2d 865) (1997). The threshold issue in a negligence cause of action is whether the defendant owes the plaintiff a duty of care, and whether such a duty of care exists is a question of law. *City of Rome v. Jordan*, 263 Ga. 26, 27 (426 SE2d 861) (1993); *Bradley Center, Inc. v. Wessner*, 250 Ga. 199, 200 (296 SE2d 693) (1982). Generally, "there is no duty to control the conduct of third persons to prevent them from causing physical harm to others." Id. at 201. Under OCGA § 51-3-1, however, an owner or occupier of a premises may be held liable for failure to exercise ordinary care to protect invitees on the premises from the criminal attacks of third persons if those attacks are foreseeable. *Doe*, 268 Ga. at 605. "Georgia decisions considering the liability of property owners [under OCGA § 51-3-1] for criminal acts by third parties uniformly limit their discussions to the claims of invitees." *Barnes v. St. Stephen's Missionary Baptist Church*, 260 Ga. App. 765, 767 (580 SE2d 587) (2003). Moreover, the duty set forth in OCGA § 51-3-1 for owners or occupiers of a premises to protect invitees from foreseeable criminal attacks arises from the owner's or occupier's control over the premises. Id.

The lot rental agreement and the restrictive covenants show that Chateau retained a qualified right of possession and control over the common areas in Smokecreek which Chateau invited the residents to use, such as the streets, designated storage area, clubhouse, swimming pool, exercise room, and laundry facilities. This control over the common areas imposed a duty on Chateau under OCGA § 51-3-1 to protect invitees in those areas. *Maloof v. Blackmon*, 105 Ga. App. 207, 208 (124 SE2d 441) (1962); *Godwin v. Olshan*, 161 Ga. App. 35, 36 (288 SE2d 850) (1982). Conversely, the lot rental agreement shows that Mason took exclusive possession and control over the lot she rented from Chateau for the location of her mobile home. Because Chateau fully parted with possession of the rented lot, it had no control over the lot and no duty under OCGA § 51-3-1 to protect Mason on the lot. *Plott v. Cloer*, 219 Ga. App. 130, 131 (464 SE2d 39) (1995); *Stephens v. Clairmont Center*, 230 Ga. App. 793, 794-795 (498 SE2d 307) (1998); *Godwin*, 161 Ga. App. at 36; *Maloof*, 105 Ga. App. at 208. The fact that Chateau retained a right of access to the rented lot for inspection, maintenance, and emergencies is not evidence of control over the lot sufficient to impose a duty on Chateau pursuant to OCGA § 51-3-1. *Godwin*, 161 Ga. App. at 36. Mason owned and had exclusive possession and control of the mobile home she placed on the

lot, so she could not be Chateau's invitee under OCGA § 51-3-1 in her own mobile home. It follows that Chateau had no control of the mobile home, that Chateau was not an owner or occupier of the mobile home, and therefore Chateau had no duty under OCGA § 51-3-1 to protect Mason in the mobile home. See *Plott*, 219 Ga. App. at 131.

In response to Chateau's motion for summary judgment and on appeal from the grant of summary judgment, Mason argued that Chateau owed her a duty under OCGA § 51-3-1 to protect her as an invitee on the premises. Mason does not take issue with the principle that Chateau had no duty under OCGA § 51-3-1 with respect to premises over which it had no control. Rather, Mason argues that Chateau had control over her mobile home sufficient to impose a duty to protect her as an invitee under OCGA § 51-3-1 because the Smokecreek restrictive covenants "are demonstrative of the control [Chateau] has over the entire mobile home park." There is no basis for construing the Smokecreek restrictive covenants as giving Chateau the type of control that would impose a duty under OCGA § 51-3-1 to protect Mason as an invitee in her mobile home or on the rented lot. Some restrictive covenants required residents to own their mobile homes and set forth rules with respect to the size, alterations to, and maintenance of mobile homes. Other restrictions dealt with matters such as the distinction between residents and guests, use of common area facilities by guests, pets, fences, signs, guns in the community, alcoholic beverages in the common areas, traffic and vehicles, parking, general use of the common area facilities, and management-related access to home sites. None of the restrictive covenants gave Chateau the right to exercise possession and control over Mason's mobile home or the rented lot sufficient to impose a duty under OCGA § 51-3-1. See *Ray v. Smith*, 259 Ga. App. 749-751 (577 SE2d 807) (2003); *Ladson Investments v. Bagent*, 151 Ga. App. 24-25 (258 SE2d 718) (1979). Because Chateau owed no duty to Mason under OCGA § 51-3-1 to protect her from the rape in her mobile home, an essential element necessary to Mason's claim was absent, and the trial court properly granted summary judgment in favor of Chateau. *Lau's Corp.*, 261 Ga. at 491, 495.

Apart from her claim under OCGA § 51-3-1, Mason also contends that, in its internal rules and by its representations to residents, Chateau assumed a duty to provide security in the entire Smokecreek community, including the areas under her control. Mason points to evidence that the Chateau manager told her that Smokecreek was safe, and that at least one other resident said the manager told him there was a security officer patrolling during the day and night, but he never saw security. Mason points out that the restrictive covenants she signed when she moved to Smokecreek stated that Chateau would take all reasonable means "to insure that your residency

is pleasant and enjoyable," and that residents knew from their applications for residency that Chateau could do a criminal background check. As to Chateau internal documents, Mason shows that the Chateau Operations Manual and Risk Management and Safety Manual state in general that Chateau had a goal of providing its employees and residents with a safe, helpful work and residential environment. Letters from the Chateau president and chief operating officer which accompanied the Safety Manual further stated that Chateau was committed to the safety of its employees, residents, and guests; that safety is one of the highest priorities at Chateau communities; that safety is part of everyone's job; that safety awareness is the key to success, and that Chateau was instituting a risk and safety committee.

> A landowner does not become an insurer of safety by taking some security precautions on behalf of invitees. Undertaking measures to protect patrons does not heighten the standard of care; and taking some measures does not ordinarily constitute evidence that further measures might be required. If a defendant undertakes to do more for the benefit of another person than the law requires, he or she may be held liable if he or she acts unreasonably or makes the situation worse, by increasing the danger, or by misleading the plaintiff into belief that it has been removed, or by depriving the plaintiff of the possibility of help from other sources.

(Citation and punctuation omitted.) *Doe v. HGI Realty*, 254 Ga. App. 181, 182-183 (561 SE2d 450) (2002). There is no basis for concluding that any of the above general oral representations, or written statements in the restrictive covenants, residency application, or Chateau Operations Manual and Risk Management and Safety Manual constituted an undertaking or contractual assumption by Chateau to provide security for the inside of Mason's mobile home where the rape occurred, for the exterior door of the home through which the rapist gained entry, or on the lot Mason rented. The record shows that, despite any representation made by Chateau, Mason was aware she was responsible for security at her mobile home, and she was also aware of the prior attack and rape at Smokecreek. As the majority opinion points out, Smokecreek residents who attended a neighborhood watch meeting after the first rape and before Mason was raped knew that Smokecreek did not provide security. There is no evidence to support a finding that Chateau assumed a duty which increased the danger to Mason, misled Mason to believe the danger had been removed, or deprived her of possible help from other sources. *Owens*

120

*v. DeKalb Med. Center*, 253 Ga. App. 19, 23 (557 SE2d 404) (2001). The trial court properly granted summary judgment in favor of Chateau on these claims. *Lau's Corp.*, 261 Ga. at 491.

DECIDED JUNE 23, 2006 — 

*Gregory, Christy, Maniklal & Dennis, Gary C. Christy, Preyesh K. Maniklal, Isenberg & Hewitt, Melvin L. Hewitt, Jr.*, for appellant.
*Drew, Eckl & Farnham, Stevan A. Miller, Barbara A. Marschalk*, for appellees.