### A11A0218. MOSES v. JORDAN.

(714 SE2d 262)

SMITH, Presiding Judge.

Mary Helen Moses appeals from the trial court's order granting summary judgment in favor of her former partner, Randall Jordan, on her counterclaim against him for wrongful dissolution of their law partnership. She asserts the trial court erred in (1) granting summary judgment on the wrongful dissolution claim, (2) granting Jordan's motion for judgment on the pleadings with regard to the dissolution date of the partnership, (3) granting a protective order to Jordan with regard to her requests for admission, and (4) ordering her to file personal property with the clerk of the court and subsequently providing it to Jordan. For the reasons set forth below, we find merit in all of these claims and reverse.

Summary judgment is only proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. OCGA § 9-11-56 (c). "A de novo standard of review applies to an appeal from a grant of summary judgment, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant." *Matjoulis v. Integon Gen. Ins. Corp.*, 226 Ga. App. 459 (1) (486 SE2d 684) (1997).

So viewed, the record shows that in 2000, Moses began practicing law as a contract attorney for Jordan's law firm, Jordan & Bristol ("J & B") in Brunswick, Georgia. The majority of Moses's work involved the "preparation of motions and briefs at the trial and appellate level."

After Steven Bristol left the partnership in December 2002, Jordan and Moses formed a new partnership, Jordan and Moses, effective January 1, 2003. At the outset, Jordan was the rainmaker

and trial lawyer, and Moses was the writer, manager, and business person. In 2004, Moses started traveling more and the day-to-day management of the law firm was delegated to two associate attorneys.

In the spring of 2006, Jordan first started thinking about ending his partnership with Moses based upon his assertion that she spent too much time in the office talking about her personal problems. In the summer of 2006, Jordan "concluded that [Moses]'s behavior in the workplace had become so divisive, unprofessional and inappropriate that [his] law practice was suffering." In August, he asked two associate attorneys and the office manager to prepare memos outlining their experiences with Moses to assist him as he "considered whether to continue to practice law with [Moses]." Moses was not aware that Jordan asked the employees for these memos.

Based on her awareness that there were management issues in the office, Moses sent a memo to Jordan expressing her concerns about the workplace and offering to return to a more active management role, or in the alternative, return to an "of counsel" position with the firm. At a scheduled partner's meeting on August 16, 2006, Jordan told Moses that he was "considering dissolving the partnership." In her affidavit, Moses averred that she "had no idea that [Jordan] was considering dissolving the partnership" before the August 16 meeting. In an effort to respond to the criticisms of her behavior with other law firm employees, Moses offered "to work in an 'of counsel' role from my home" and Jordan "seemed receptive to that proposal." According to Moses, they agreed to discuss the matter further in late September after completion of a scheduled trial that required Jordan to be out-of-state.

On Sunday, August 27, 2006, Jordan left a letter in Moses's office chair before leaving town that "purported to dissolve the partnership effective August 31, 2006." The following day, Moses sent an e-mail to Jordan informing him that she "did not agree to dissolve the partnership effective August 31, 2006," that she wanted to resolve the partnership "appropriately," and stated her "intention to continue to represent the firm's clients." Based upon a subsequent conversation between Moses's attorney and Jordan, Moses understood that Jordan had "agreed to maintain the status quo at the law firm" until the partnership matters were resolved. Her attorney subsequently received letters from Jordan's attorney declaring the firm dissolved no later than September 26, 2006.

Moses learned in early October that Jordan had informed the firm's three railroad clients that the firm had dissolved. In December 2006, Moses learned that Jordan had sent out a letter announcing the formation of The Jordan Firm.

In January 2007, Jordan filed a motion for declaratory judgment

in superior court asking for a declaration that the law partnership "was legally dissolved by action of the Plaintiff on September 26, 2006" and that Moses was "owed no further monies from assets of the partnership as a result of the dissolution . . . and that . . . [Moses] be required to account for any excess monies that may have been paid to her by the firm." Moses answered and asserted counterclaims for breach of the partnership agreement, wrongful dissolution of the partnership, breach of fiduciary duty, conversion, tortious interference with contract and business relationships, defamation and disparagement, recoupment, trespass, constructive eviction, punitive damages, and attorney fees and costs of litigation under OCGA § 13-6-11.

Following discovery, Jordan moved for summary judgment on Moses's wrongful dissolution counterclaim, which the trial court granted. The trial court also granted Jordan a protective order with regard to requests for admission served by Moses. Additionally, the trial court ordered Moses, sua sponte, to turn over to the clerk of court a portable hard drive acquired by Moses before Jordan filed suit against her.

1. Moses asserts the trial court erred by granting Jordan's motion for summary judgment on her counterclaim for wrongful dissolution of the partnership. Because Moses has raised genuine issues of fact with regard to this claim, we agree.

The Uniform Partnership Act, OCGA § 14-8-1 et seq., provides that the dissolution of a partnership can occur in a variety of ways, including "[b]y the express will or withdrawal of any partner." OCGA § 14-8-31 (a) (2). "Upon dissolution of a partnership the partners cease to be associated in the carrying on of the partnership. The partnership shall continue until termination pursuant to Code Section 14-8-30 and until termination the partners shall be associated in the winding up of the partnership." OCGA § 14-8-29. Finally, "[o]n dissolution the partnership is not terminated, but continues until the winding up of the partnership affairs is completed." OCGA § 14-8-30. The Act also provides the following remedy for wrongful dissolution:

> (b) . . . [W]hen dissolution is caused wrongfully either in contravention of the partnership agreement or as a result of other wrongful conduct of a partner, the rights of the partners shall be as follows:
>
> (1) Each partner who has not caused the dissolution wrongfully shall have:
>
> . . .
>
> (B) The right, as against each partner who has caused the dissolution wrongfully, to damages for such

wrongful dissolution and to any other right or remedy provided for in the partnership agreement.

OCGA § 14-8-38 (b) (1) (B).

There are few Georgia cases addressing the scope of a partner's cause of action for wrongful dissolution under the Uniform Partnership Act. In the seminal case, this court followed the reasoning of the California Supreme Court and held:

> Any partnership agreement includes, as a matter of law, an agreement for each partner to act in "the utmost good faith" toward the other partner. See OCGA § 23-2-58. [Cit.] The power of a partner to dissolve the partnership at will, like any other power held by a fiduciary, must be exercised in good faith. A partner may not freeze out a co-partner and appropriate the business to his own use. A partner may not dissolve a partnership to gain the benefits of the business for himself, unless he fully compensates his co-partner for his share of the prospective business opportunity. Even though a partner has a right to dissolve the partnership, if, however, it is proved that the partner acted in bad faith and violated his fiduciary duties by attempting to appropriate to his own use the new prosperity of the partnership without adequate compensation to his co-partner, the dissolution would be wrongful and the partner would be liable as provided by the section of the Uniform Partnership Act defining the rights of partners upon wrongful dissolution for violation of the implied agreement not to exclude the other partner wrongfully from the partnership business opportunity. [Cit.]

(Punctuation omitted.) *Arford v. Blalock*, 199 Ga. App. 434, 437-438 (6) (405 SE2d 698) (1991), citing *Page v. Page*, 55 Cal. 2d 192, 196-198 (359 P2d 41) (1961).

In *Wilensky v. Blalock*, 262 Ga. 95 (414 SE2d 1) (1992), the Georgia Supreme Court endorsed "the reasoning of the [Georgia] Court of Appeals," in *Arford*, supra, and affirmed. Id. at 98-99 (3). It held that a viable claim for wrongful dissolution of the partnership existed based upon a partner's conduct in physically excluding a partner "from the partnership's place of business" and keeping "for himself all the partnership's material assets and continuing income from its mortgage origination business." Id. At the time of the wrongful dissolution, the partners in *Arford* had been in negotiations to dissolve the partnership, which included "discussing the amount it would take for one of them to buy out the other's interest in the

partnership." Id. at 96-97.

More recently, this court affirmed a trial court's award of damages for wrongful dissolution of a partnership when a former partner in a check-cashing business closed the business while his partner was traveling, sent a letter terminating the business, occupied a new space near the old business, actively solicited customers away from his former partner, appropriated profits to his own use, and failed to compensate his former partner in any way. *Asgharneya v. Hadavi*, 298 Ga. App. 693, 697-698 (680 SE2d 866) (2009).

Based on these decisions, Moses argues she can avoid summary judgment on her wrongful dissolution claim if she can demonstrate that genuine issues of fact exist as to whether Jordan "froze [her] out" and appropriated the business to his own use or dissolved the partnership to gain the benefits of the business for himself without compensating her for a prospective business opportunity. Moses overlooks another crucial element of a wrongful dissolution claim: the partner's *decision* to dissolve must be wrongful. Stated differently, the power to dissolve "must be exercised in good faith." *Arford*, supra, 199 Ga. App. at 438. Compare *Chaney v. Burdett*, 274 Ga. 805, 807 (2) (560 SE2d 21) (2002) (partner's general duty to act in utmost good faith "continues until the affairs of the partnership are wound up" and a breach of this duty *after* dissolution can give rise to a claim for breach of fiduciary duty).

With regard to Jordan's state of mind at the time he decided to dissolve the partnership, Moses points to his conduct in keeping an entire $180,000 fee for himself after depositing it into the partnership account. The record shows that in December 2005, Jordan settled a case during a mediation for which he earned an $180,000 contingent fee. When Jordan received the settlement check three months later, it was made payable to Jordan and Moses. He instructed the firm's bookkeeper to deposit it into the firm account with a handwritten note explaining:

> This case pre-dated the formation of Jordan & Moses and MH and I have agreed that 100% of the fee goes to me. In that regard, I have written myself a check for $180,000 out of the J & M account. Unfortunately, we're having to send that money to the IRS. But, at least we have it to send! Please have this check deposited ASAP.

In his deposition, Jordan testified that Moses knew that he would deposit the check into the firm's bank account and that they had an agreement that he would keep the entire fee.

Moses averred in her affidavit:

> I did not agree that the [case was] outside the scope of our partnership agreement, nor did I ever agree that I would not be entitled to receive fees generated from the firm's representation of [the client]. . . . I was aware of the work being performed by . . . Jordan and other employees of Jordan and Moses. . . . I even personally participated in the firm's handling of [the] matter[.] . . .

Although Moses was aware that the case had settled in late 2005, she stated:

> I did not know when the $180,000 came in. I did not know the amount of $180,000. I did not know that he took it right back out. I knew nothing of that until in September after all of this happened I was looking at the P[rofit] and L[oss] and I was trying to get myself current because my quarterly tax payments were due.

Moses also produced a copy of a partnership agreement signed by Jordan that required him to share the net profits of the firm with her equally.

Based upon Moses's evidence that Jordan secretly kept the proceeds of this check for himself in March 2006 and his testimony that he first contemplated dissolving the firm in the spring of 2006, we find that Moses has presented at least one genuine issue of material fact with regard to her wrongful dissolution claim.[1]

2. Moses contends the trial court erred by determining as a matter of law based upon the parties' pleadings alone that the partnership "was lawfully dissolved in September 2006." We agree.

The record shows that Moses moved for partial judgment on the pleadings with regard to her claim that Jordan breached the express terms of the partnership agreement by unilaterally dissolving it in September 2006. Jordan filed a cross-motion to dismiss asking the court to find as a matter of law that the partnership "was legally dissolved by action of the Plaintiff on September 26, 2006." Jordan filed a second motion to dismiss regarding Moses's counterclaim for tortious interference with contract and business relationships.

On December 16, 2008, the trial court issued a written order denying Moses's motion for partial judgment on the pleadings, and granting Jordan's motion to dismiss Moses's counterclaim in tort.

---

[1] Because the issue of damages is not before us in this appeal, we express no opinion as to the proper measure of damages for Moses's wrongful dissolution claim.

The trial court's order does not reference Jordan's separate motion for judgment on the pleadings with regard to the date the partnership was dissolved.

On January 7, 2009, the trial court noted in a discovery order that "*since the Court has found that the partnership was lawfully dissolved in September 2006*, each party shall disclose to the other the gross revenues for their respective practices for 2007." (Emphasis supplied.) Moses contends that the trial court erred by making this finding for the first time in a discovery order, particularly since there was a dispute in the pleadings with regard to the dissolution date of the partnership. The record shows that at the time of the trial court's discovery ruling, the parties had not yet submitted any evidence to the trial court regarding the date of the dissolution.

The record shows that Jordan's complaint for declaratory judgment against Moses asserts that he notified her on August 27, 2006, that he intended to dissolve their law partnership. According to Jordan's complaint, "the partnership remained in operation until September 26, 2006, when it was finally dissolved by [Jordan]." In her verified answer, Moses denied that the partnership was dissolved on September 26, 2006. In her counterclaim, she asserted that the partnership billed clients for work performed by her in September 2006 and that she took her last partnership draw in October 2006.

It appears that at the time of its ruling on the motion for protective order, the trial court believed it had resolved Jordan's pending motion for judgment on the pleadings with regard to the lawful dissolution of the partnership in September 2006 in Jordan's favor. Based upon the record before us, however, the protective order contains the trial court's only ruling on the issue, and we will construe it as the grant of Jordan's motion for judgment on the pleadings.

"[A] motion for judgment on the pleadings should be granted only where the pleadings disclose with certainty that the plaintiff would not be entitled to relief under any state of provable facts." (Citations and punctuation omitted.) *Kelley Mfg. Co. v. Martin,* 296 Ga. App. 236, 237 (674 SE2d 92) (2009). In this case, the pleadings demonstrate disputed facts with regard to the operative date of the partnership's dissolution. Consequently, the trial court erred by granting Jordan's motion based solely upon the pleadings before it. *Wright v. Swint,* 224 Ga. App. 417, 418-419 (1) (480 SE2d 878) (1997) (reversing trial court's grant of motion to dismiss because trial court improperly decided issue of fact).[2]

---

[2] We express no opinion as to whether evidence presented by the parties after the trial court's ruling would warrant a finding on summary judgment that the dissolution date for the

3. In an apparently related — although confusing — claim of error, Moses asserts the trial court erred by concluding as a matter of law that "the mutual consent provision in the partnership agreement violated public policy." Moses apparently takes issue with one statement made in the trial court's order denying her motion for judgment on the pleadings with regard to her claim that Jordan breached the partnership agreement. She does not assert in her enumeration of error, however, that the trial court erred in denying her motion for judgment on the pleadings. Instead, she asserts the trial court erred by using its public policy finding to conclude that Jordan lawfully dissolved the partnership on September 26, 2006. Based upon our holding in Division 2, the specific error asserted here is moot.

4. Moses asserts the trial court erred by granting Jordan's request for a protective order with regard to her second request for admissions.

> In this state, the determination of the permissible extent of discovery and use of protective orders to insure that a party's discovery efforts are kept within that permissible ambit are matters which are generally addressed to the discretion of the trial judge. However, this must be a sound and legal discretion based on evidence and a showing of good cause.

(Citation and punctuation omitted.) *DeLoitte Haskins & Sells v. Green*, 187 Ga. App. 376, 379 (2) (370 SE2d 194) (1988).

The record shows that Moses served a second request for admissions asking Jordan to admit that 327 specific credit card charges spanning a three-year period were not ordinary and necessary business expenses, that 58 expert witness invoices for services performed before the formation of the partnership were improperly paid from partnership funds, that the partnership made payments on three personal loans taken out by Jordan before the formation of the partnership, that nine specific personal expenses were paid out of partnership funds, and that Jordan or his agents removed files and programs from Moses's personal computer without her knowledge. Jordan moved for a protective order on the grounds that the

requests were designed merely to annoy, embarrass and

---

law firm was September 26, 2006. We note that the Uniform Partnership Act draws a distinction between the dissolution of a law firm, its continuation after dissolution during the winding-up period, and its termination after the winding-up process is completed. See OCGA §§ 14-8-29, 14-8-30, and 14-8-31.

> oppress Plaintiff and to cause him undue burden and expense. Furthermore, . . . defendant has in a wholesale fashion and without any basis attempted to shift the burden of proof on Defendant's counterclaim and place upon the Plaintiff the burden of substantiating legitimate business expenses covering a substantial period of time.

In his supporting brief, Jordan argued with regard to the credit card charges that "Defendant has used no discretion in making the requests and instead included numerous charges that were for obvious ordinary and necessary business expenses. . . ." He asserted that the remaining requests "demonstrate bad faith on the part of the defendant" because she was "fully aware that all expert witness fees were properly paid . . . , that the lines of credits were utilized for . . . firm business, and that the [alleged personal expenses] were routinely paid out of [partnership] funds." After reviewing the first 30 requests to admit with regard to the credit card charges, Jordan determined that 28 were legitimate expenses and two were for alleged charges for which he could not find any documentation. Based on his review of the first 30 requests, Jordan asserted that Moses could not have made the numerous requests in good faith. Jordan supported the claims made in his brief with an affidavit.

In an affidavit filed in opposition to Jordan's motion for protective order, Moses averred: "I took each American Express bill and examined it carefully and only included those charges which I found suspicious." Examples provided by Moses include "charges of over $11,000 from a Ritz Carlton hotel in Jamaica for lodging December 22-29, 2004, [and] a charge of $361.34 from Bennie's Red Barn, a local restaurant, on New Year's Eve. . . ." She explained that she requested more information about these and other charges because "they appeared to be holiday entertainment for Mr. Jordan's family and friends" or because it seemed unlikely that Jordan would be in the location for business or would be billing a client to spend the night in a hotel close to his home. Based on her review of one monthly bill, she believed that her requests accounted for "less than 10% of the total number of charges on the firm's credit card statements." She sought the information in the request to determine whether she received all the proceeds from the firm to which she was entitled and whether she should be liable for the firm's debts as alleged in Jordan's complaint.

During the hearing on the motion for protective order, Moses's counsel pointed out that because Jordan sought a ruling from the court that Moses was owed nothing further from the partnership,

Moses was entitled to serve requests for admissions to show that Jordan used the

> bank account and this credit card of the firm as his own personal account to pay for his personal family expenses, personal family Christmas trips to Jamaica, . . . and expects Ms. Moses to share in that expense. . . . He says in response that she knew he was doing all this and that she approved of that. Well, that is hotly contested. She did not know that he was using her money to pay for his excesses and his lifestyle. And she certainly didn't agree to it. . . . [T]he requests to admit are properly set forth to establish the evidence in support of or in opposition to all claims and defenses of either party.

Jordan's attorney countered that the number of requests standing alone "show a burden."

After taking the matter under advisement, the trial court issued a written order concluding that "Defendant's massive request for admissions is burdensome and oppressive, and Plaintiff's request for a protective order with respect to them is granted. Defendant is entitled to depose Plaintiff to explore his knowledge of the matters raised in the requests." The trial court made no finding, however, with regard to whether Moses asserted the requests in bad faith or for the purpose of harassment.

While it is true that a trial court has broad discretion with regard to entering discovery orders, "this discretion must be based on sound legal analysis with an eye to promoting the purpose of discovery and limiting its abuse. Discovery should not be prohibited where the effect is to frustrate that purpose and prevent legitimate discovery." (Citations and footnotes omitted.) *International Harvester Co. v. Cunningham*, 245 Ga. App. 736, 739 (1) (538 SE2d 82) (2000).

> Discovery is an integral and necessary element of our civil practice. Wide latitude is given to make complete discovery possible. The broad purpose of the discovery rules, under the Civil Practice Act, is to enable the parties to prepare for trial so that each party will know the issues and be fully prepared on the facts. Discovery is specifically designed to fulfill a two-fold purpose: issue formulation and factual revelation. The use of the discovery process has been held to be broadly construed.

(Citations, punctuation and footnote omitted.) Id. at 738-739 (1).

Requests for admission, in particular, are designed "with a view toward establishing uncontested facts that go to the merits of the case." (Citation and punctuation omitted.) *Mote v. Tomlin*, 136 Ga. App. 616, 617 (1) (222 SE2d 57) (1975). In addition, it is well settled that

> [p]rotective orders should not be entered when the effect is to frustrate and prevent legitimate discovery. *Such are intended to be protective — not prohibitive —* and, until such time as the court is satisfied by *substantial evidence that bad faith or harassment motivates the discoverer's action*, the court should not intervene to limit or prohibit the scope of pre-trial discovery.

(Citations and punctuation omitted.) *Osborne v. Bank of Delight*, 173 Ga. App. 322, 324 (2) (326 SE2d 523) (1985).

In this case, the trial court issued the protective order because the requests to admit were "burdensome and oppressive" based upon the sheer number standing alone.[3] The record before the trial court, however, did not show "substantial evidence of bad faith or harassment," id., on the part of Moses in issuing the requests for admission. Her requests, while numerous, were specific and designed to narrow the issues in the case. They consisted of simple and straightforward recitations of fact that could be readily admitted or denied. We therefore conclude that the trial court abused its discretion by granting a blanket protective order based solely upon the number of requests in this particular case.[4] See *Mead Corp. v. Masterack*, 243 Ga. 213, 215 (253 SE2d 164) (1979) (trial court abused discretion by granting order limiting discovery). Compare *Parks v. Multimedia Technologies*, 239 Ga. App. 282, 296-297 (6) (520 SE2d 517) (1999) (evidence before trial court authorized finding of party's bad faith in seeking discovery).

5. Moses contends the trial court erred in confiscating from her possession her only portable hard drive copy of the law firm's server

---

[3] Courts from other jurisdictions have declined to grant protective orders based on the number of requests for admissions standing alone. See, e.g., *Synthes (U.S.A.) v. Global Medical*, 2006 U. S. Dist. LEXIS 87151 (E.D. Pa., Nov. 29, 2006) (declining to find 622 requests to admit oppressive); *McCloud v. Board of Geary County Commrs.*, 2008 U. S. Dist. LEXIS 61612 C. (slip op. at 8) (D. Kan., Aug. 11, 2008) (rejecting argument that party abused use of request for admission simply because of the number of requests (424) it served). While these unpublished opinions are not controlling, we find the reasoning persuasive "[b]ecause Georgia's Civil Practice Act is modeled on the Federal Rules of Civil Procedure." *McKesson HBOC v. Adler*, 254 Ga. App. 500, 503 (1), n. 4 (562 SE2d 809) (2002).

[4] Our holding in this case is necessarily limited to the particular requests made in the particular case before us. The permissible scope of discovery, by its very nature, must be determined on a case-by-case basis.

and giving it to Jordan. The record shows without dispute that Moses obtained the portable hard drive months before Jordan filed his lawsuit against her. The trial court ordered her to file it with the clerk sua sponte in response to Jordan's motion for a more limited protective order.

The trial court's authority with regard to protective orders under OCGA § 9-11-26 (c) is limited to rulings in discovery matters and in response to motions to compel. A trial court may under the discovery rules order a party to "produce and permit [a] party . . . to *inspect and copy, test, or sample* any tangible things which constitute or contain matters within the scope [of discovery]. . . ." (Emphasis supplied.) OCGA § 9-11-34 (a) (1). But nothing in the Civil Practice Act provides authority for a trial court to confiscate the personal property of a party through a protective order under the guise of determining the scope of permissible discovery. See OCGA §§ 9-11-26 (c) through 9-11-37. Compare OCGA § 44-12-151 (outlining remedies available to plaintiff in action to recover personal property); *Taylor v. Powertel*, 250 Ga. App. 356, 358 (2) (551 SE2d 765) (2001) (summarizing causes of action for conversion and statutory trover in Georgia).

In this case, the trial court abused its discretion by utilizing a discovery order to force Moses to turn over personal property in her possession, particularly in light of the trial court's subsequent determination that there was no evidence that it had been "obtained by [Moses] in bad faith."

*Judgment reversed. Dillard and McFadden, JJ., concur.*

DECIDED JULY 7, 2011 — 

*Martenson, Hasbrouck & Simon, Peter V. Hasbrouck, Mark E. Robinson*, for appellant.

*Blasingame, Burch, Garrard & Ashley, Gary B. Blasingame, Robert P. Killian*, for appellee.