**THIRD DIVISION**
**MIKELL, P. J.,**
**MILLER and BLACKWELL, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)**
**http://www.gaappeals.us/rules/**

**June 29, 2012**

# In the Court of Appeals of Georgia

A12A0649. NORFOLK SOUTHERN RAILWAY COMPANY v.
    HARTRY et al.

BLACKWELL, Judge.

On June 16, 2010, a train operated by Norfolk Southern Railway Company collided with a tractor-trailer in Clayton County. Pursuant to an agreement between Norfolk Southern and Science Applications International Corporation, Inc. ("SAIC"), the train was equipped with an event data recorder known as "RailView" that is owned by SAIC and licensed to Norfolk Southern. The RailView device records digital images of the train's movement, as well as data about the train's speed, direction, horn activity, and braking activity.

Winford Hartry, who was the engineer of the train, was injured as a result of the collision. After Hartry and his wife sued Norfolk Southern and others, they sought

discovery from Norfolk Southern of the data recorded by the train's RailView system around the time of the collision. Norfolk Southern agreed to provide a copy of the data disk to the Hartrys, but only under certain conditions, and Norfolk Southern advised the Hartrys that they would only be able to view the information on the RailView data disk if they "obtain[ed] the proprietary Rail[V]iew Playback software directly from SAIC" for $500. Norfolk Southern claimed that it could not provide the Hartrys with a copy of the data disk without imposing these conditions because it owned nothing more than a license to the SAIC software, that the software is necessary to view the data, and Norfolk Southern's agreement with SAIC did not allow it to provide the software to the Hartrys or anyone else.

The Hartrys filed a motion to compel discovery, and Norfolk Southern filed a motion for a protective order to prevent the Hartrys from requiring it to produce the RailView data except under the conditions it had offered. The Court below granted the motion to compel and denied the motion for a protective order. Its order requires Norfolk Southern to provide the RailView video and data recordings "in some usable form to the [Hartrys]" either by obtaining permission from SAIC to produce the data to the Hartrys (presumably through Norfolk Southern's purchase of a $500 license for the benefit of the Hartrys), by providing the Hartrys with a computer with the

necessary software, or by producing the data through "any other method the parties may agree to . . . ."[1] Norfolk Southern now appeals from that ruling, claiming that the court below erred in granting the Hartrys' motion to compel.[2] But we will not reverse a trial court's ruling on discovery matters absent a clear abuse of discretion. *Ambassador College v. Goetzke*, 244 Ga. 322, 323 (1) (260 SE2d 27) (1979); *Dempsey v. Kaminski Jewelry*, 278 Ga. App. 814, 815 (630 SE2d 77) (2006); see also *Vaughn & Co. v. Saul*, 143 Ga. App. 74, 80 (4) (237 SE2d 622) (1977) ("Historically it has been the policy of Georgia appellate courts not to interfere with the trial judge's broad discretion granted to him under the discovery provisions of the Civil Practice Act."). We find no abuse of discretion here.

Pursuant to OCGA § 9-11-26 (b) (1), parties to a lawsuit "may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action." Here, the relevance of the materials sought to be discovered,

---

[1] We note that, although the court below denied Norfolk Southern's motion for a protective order, it did place several conditions on the Hartrys' use of the data, ordering them to file any of the digital video data under seal and precluding them from making copies of the images or using the images for any purpose other than their lawsuit.

[2] Norfolk Southern does not appear to appeal explicitly the denial of its motion for a protective order, although the issues involved in the grant of the motion to compel and the denial of the motion for a protective order are substantially identical.

which relate to the functioning of the train before and during the collision, is not disputed. Indeed, the information included in the RailView data is not only directly relevant, but it appears to be critical to the claims asserted by the Hartrys. But while the parties apparently agree about the relevance of the RailView data, they do not agree about who should bear the expense of providing the Hartrys with access to it.

Under OCGA § 9-11-34 (a), any party may request that another party "produce and permit the party making the request . . . to inspect and copy [discoverable] documents . . .." And when, as here, the document to be produced is a "data compilation" from which information can be obtained, the producing party is tasked with translating the document "through detection devices into reasonably usable form."[3] Id. So, while a requesting party does not have the right to unrestricted and

---

[3] Although OCGA § 9-11-34 does not define "data compilation" or describe when such a compilation must be translated by the producing party, the Georgia discovery rules are based on the 1970 amendments to the Federal Rules of Civil Procedure. *McKinnon v. Smock*, 264 Ga. 375, 380 (2) (445 SE2d 526) (1994) (Fletcher, J., dissenting); see also *Trammel v. Nat. Bank of Ga.*, 159 Ga. App. 850, 851 (1) (285 SE2d 590) (1981). The Advisory Committee notes to those amendments provide that the rule "applies to electronics data compilations from which information can be obtained only with the use of detection devices, and that when the data can as a practical matter be made usable by the [requesting] party only through [the producing party]'s devices, [the producing party] may be required to use his devices to translate the data into usable form." *Crown Life Ins. v. Craig*, 995 F2d 1376, 1383 (II) (7th Cir. 1993). And the 1972 proposed rules advisory committee note to Federal Rule of Evidence 803(6) explains that "the expression 'data compilation' is used as

direct access to a producing party's data compilations,[4] OCGA § 9-11-34 (a) allows the requesting party to inspect and copy the data after the producing party has translated the data into a reasonably usable form. And while the requesting party generally must bear the burden of its own inspection and copying,[5] the producing party may be required to bear the expense of producing the documents and, when necessary, translating them into reasonably usable form.

The burden of discovery on the producing party will, therefore, vary from case to case, but courts have the discretion under OCGA § 9-11-26 (c) to protect the producing party against, among other things, "undue burden or expense" by a

---

broadly descriptive of any means of storing information other than the conventional words and figures in written or documentary form. It includes, but is by no means limited to, electronic computer storage. The term is borrowed from revised Rule 34(a) of the Rules of Civil Procedure." *Williams v. Sprint/United Mgmt. Co.*, 230 F.R.D. 640, 648 (II) (B) (1) (b) (D. Kansas 2005).

[4] See *Moses v. Jordan*, 310 Ga. App. 637, 648 (5) (714 SE2d 262) (2011) (reversed on other grounds by *Jordan v. Moses*, ___ Ga. ___ (Case No. S11G1772, decided May 7, 2012)) (trial court may allow requesting party to inspect, copy, test, or sample a tangible thing, but "nothing in the Civil Practice Act provides authority for a trial court to confiscate the personal property" of the producing party).

[5] See *Nichols v. Ga. Television Co.*, 250 Ga. App. 789, 792 (2) (552 SE2d 550) (2001) (trial court properly exercised its discretion when it concluded that it was reasonable to require the requesting party to pay a third party $200 for the cost of copying videotapes).

protective order that restricts discovery or requires that the requesting party be permitted to conduct the discovery only upon specified terms and conditions. See *Simmons v. Community Renewal &c. LLC*, 286 Ga. 6, 8 (3) (685 SE2d 75) (2009); see also *Bloodworth v. Bloodworth*, 225 Ga. 379, 392 (8) (169 SE2d 150) (1969).[6] Unless the trial court has clearly abused its discretion, however, we will defer to its conclusion about whether a protective order should be granted. See *McKesson HBOC v. Adler*, 254 Ga. App. 500, 505 (3) (562 SE2d 809) (2002).

Here, Norfolk Southern filed a motion for a protective order, but the court below concluded that Norfolk Southern would not be saddled with an "undue burden or expense" if it was required to bear the cost of producing the RailView data in a form that would allow the Hartrys to make their own copy of the data. It appears undisputed that, at most, producing the data in a reasonably usable form would require Norfolk Southern to pay SAIC $500 for an additional license for the Hartrys

---

[6] In addition, where the requesting party has filed a subpoena requesting the production of documents, the court has the discretion to "quash or modify the subpoena if it is unreasonable and oppressive, or to condition denial of the motion upon the advancement . . . of the reasonable cost of producing the . . . documents." OCGA § 9-11-45 (a) (1) (C); *Ga. Emission Testing v. Reheis*, 268 Ga. App. 560, 564 (2) (602 SE2d 153) (2004).

to use the SAIC software.[7] We cannot say that the court below clearly abused its discretion in making such a determination, especially given the crucial nature of the evidence, the relatively minor cost of the license when compared to the amount at stake in the lawsuit,[8] and the fact that it was Norfolk Southern's decision to equip its locomotive with a licensed device for recording data so that it would only be able to provide that data to third parties upon payment of a license fee.[9]

---

[7] The record before us includes only SAIC's "standard software license agreement," and it is not clear from the record that the agreements between Norfolk Southern and SAIC were limited to this form agreement. In any event, we assume without deciding that Norfolk Southern is correct when it says that it is unable to provide the RailView data to the Hartrys unless SAIC is paid $500 for the additional license. But as we noted before, the order of the court below did not require Norfolk Southern either to pay the license fee or to violate its agreements with SAIC, but instead allowed Norfolk Southern to provide the Hartrys with access to the RailView data in several different ways, including any way agreeable to all the parties. And given that it is undisputed that the terms of any agreements between Norfolk Southern and SAIC allowed Norfolk Southern to provide the RailView data to a third party if the third party had a license to use SAIC's software, Norfolk Southern was not required by the order to violate the terms of its agreements.

[8] We note that Norfolk Southern acknowledged in its pleadings that the $500 license fee was a "nominal sum."

[9] While Norfolk Southern says in its appellate brief that it operates locomotives on over 21,000 miles of track in over 20 states and claims that the "modest cost" of a license to use the SAIC software "could lead to a tremendous burden" if it is required to pay for licenses in many other cases in the future, Norfolk Southern does not appear to have made any showing to the trial court about the estimated number of these future cases or the number of licenses, if any, that it has already had to

7

It is true, of course that a party ordinarily must finance its own litigation, see *Baum v. Village of Chittenango*, 218 F.R.D. 36, 40-41 (2) (B) (N.D. N.Y. 2003), and no one should mistake our decision today as a retreat from that principle or as a generalized endorsement of cost shifting. We hold only that, in the circumstances presented here, the decision below was no clear abuse of discretion.

*Judgment affirmed. Mikell, P. J., and Miller, J., concur*.

---

purchase. Moreover, nothing in our decision today amounts to a finding that Norfolk Southern must bear the cost of producing RailView data in a reasonably usable form in *every* case in which such data exists and is relevant.